**FAIETA et al.**

v.

**WORLD HARVEST CHURCH et al.**

2008-Ohio-3140.]

Court of Common Pleas of Ohio
Franklin County, Civil Division.

No. 06 CVH–05–7031.

Decided May 6, 2008.

56

58

Rex Elliott, Charles Cooper, and Sheila Vitale, for plaintiffs.

James Arnold, Jim Abrams, Charles Saxbe, Janica Pierce, and David Orlandini, for defendants.

BROWN, Judge.

## DECISION ON POSTTRIAL MOTIONS

### I. Introduction

{¶ 1} This matter is before the court on several posttrial motions filed by the parties. These motions will be identified and discussed in detail below.

### II. Factual and procedural history

{¶ 2} This matter went to jury trial on October 9, 2007. On October 18, 2007, the jury returned verdicts in favor of plaintiffs Michael Faieta, Lacey Faieta, and their minor son, Andrew Faieta, against defendants Richard Vaughan and World Harvest Church ("WHC"). Plaintiffs alleged that his teacher, Mr. Vaughan, had abused Andrew physically while he was enrolled in Cuddle Care, a daycare program run by WHC. Plaintiffs further alleged that WHC had negligently supervised Mr. Vaughan and engaged in conduct to "cover up" the abuse. Plaintiffs asserted claims of battery and intentional infliction of emotional distress against Mr. Vaughan and claims of intentional infliction of emotional distress and negligent supervision against WHC.

{¶ 3} Against Mr. Vaughan, the jury awarded plaintiffs compensatory damages of $134,865 and punitive damages of $100,000. Against WHC, the jury awarded

plaintiffs compensatory damages of $764,235 and punitive damages of $5 million. The jury also awarded plaintiffs attorney fees from WHC.

{¶ 4} The jury was presented with fifteen interrogatories. All of the parties agreed to these interrogatories prior to their submission to the jury. The jury answered and signed the interrogatories as follows:

1.A. Do you find by a preponderance of the evidence that Richard Vaughan intentionally harmed Andrew Faieta?—Eight jurors answered, "Yes."

1.B. Do you find by a preponderance of the evidence that Richard Vaughan's battery was the direct and proximate cause of any damages to the Faietas?—Eight jurors answered, "Yes."

2.A. Do you find by a preponderance of the evidence that Richard Vaughan and/or World Harvest intentionally inflicted serious emotional distress on the Faietas?—Eight jurors answered, "Yes."

2.B. Do you find by a preponderance of the evidence that the intentional infliction of emotional distress was the direct and proximate cause of any damages to the Faietas?—Eight jurors answered, "Yes."

3.A. Do you find by a preponderance of the evidence that World Harvest was negligent in supervising Richard Vaughan as an employee?—Eight jurors answered, "Yes."

3.B. Do you find by a preponderance of the evidence that World Harvest's negligent supervision was the direct and proximate cause of any damages to the Faietas?—Eight jurors answered, "Yes."

4. State the total amount of economic damages, if any, sustained by Michael and Lacey Faieta.—Eight jurors answered, "$152,100.00."

5. State the total amount of noneconomic damages, if any, sustained by Michael and Lacey Faieta, including any damages for pain and suffering and mental anguish.—Seven jurors answered, "$147,000.00."

6. State the total amount of noneconomic damages, if any, sustained by Andrew Faieta, including any damages for pain and suffering and mental anguish.—Eight jurors answered, "$600,000."

7.A. Do you find by clear and convincing evidence that the Faietas are entitled to punitive damages from defendant Richard Vaughan?—Eight jurors answered, "Yes."

7.B. State the total amount of punitive damages to which the Faietas are entitled from Richard Vaughan.—Seven jurors answered, "$100,000.00."

7.C. Do you find that the Faietas are entitled to attorney fees from Richard Vaughan?—Eight jurors answered, "No."

8.A. Do you find by clear and convincing evidence that the Faietas are entitled to punitive damages from defendant World Harvest?—Eight jurors answered, "Yes."

8.B. State the total amount of punitive damages to which the Faietas are entitled from World Harvest.—Eight jurors answered, "$5,000,000.00."

8.C. Do you find that the Faietas are entitled to attorney fees from World Harvest?—Eight jurors answered, "Yes."

{¶ 5} Upon conclusion of the trial, the parties agreed to postpone entry of judgment in this case so that this court could hear and decide several posttrial issues. The parties established an agreed schedule for these posttrial motions. The parties also attempted mediation, without success. The parties' initial agreed schedule was modified at their request, and the parties have now submitted a variety of posttrial motions and issues to the court for determination.

{¶ 6} Plaintiffs filed a motion for prejudgment interest on October 24, 2007. Defendants filed their opposition to the motion on December 7, 2007. Plaintiffs replied in support of the motion on December 14, 2007. Plaintiff's motion for prejudgment interest came before the court for an evidentiary hearing on February 27 and 29, 2008. At that hearing, the court also heard testimony regarding the reasonable attorney fees incurred by plaintiffs in connection with the jury's award of attorney fees against WHC. The parties submitted briefs prior to the start of the hearing. All of the parties were represented in court by their counsel. Charles Cooper and Rex Elliott represented plaintiffs. James Arnold, Charles Saxbe, David Orlandini, and Jim Abrams represented defendants.[1] Janica Pierce, another attorney that represented WHC at trial, was also present. The court heard testimony from Mr. Cooper; Michael Rourke, plaintiffs' legal expert witness; Bradley Histed, a representative of defendant WHC's insurer; Mr. Saxbe; and Mr. Orlandini.

{¶ 7} The parties requested that this court permit them to brief the issue of the application of R.C. 2315.18 and 2315.21 to the jury verdicts in this case. Defendants filed their brief on November 19, 2007. Plaintiffs responded to defendants' brief on November 28, 2007. Defendants filed their reply brief on December 10, 2007.

{¶ 8} On December 21, 2007, defendants filed their combined motions for judgment notwithstanding the verdict, new trial, and/or remittitur. Plaintiffs filed their opposition to these motions on January 4, 2008. Defendants replied in

---

1. Neither Mr. Saxbe nor Mr. Arnold participated in the trial. Mr. Saxbe serves as general counsel for WHC, and Mr. Arnold was retained after the verdict.

support of these motions on January 11, 2008. Plaintiffs filed a motion for leave to file a surreply on January 18, 2008, along with a copy of the proposed surreply. Defendants opposed the motion for leave on January 28, 2008.

{¶ 9} Defendants also submitted a proposed interlocutory judgment entry and supporting memorandum on January 18, 2008. Plaintiffs filed their response to the proposed interlocutory judgment on January 22, 2008.

## III. Motion for Judgment notwithstanding the Verdict

### A. Standard of review

{¶ 10} Civ. R. 50(B) provides:

Whether or not a motion to direct a verdict has been made or overruled and not later than fourteen days after entry of judgment, a party may move to have the verdict and any judgment entered thereon set aside and to have judgment entered in accordance with his motion * * * A motion for a new trial may be joined with this motion, or a new trial may be prayed for in the alternative. If a verdict was returned, the court may allow the judgment to stand or may reopen the judgment. If the judgment is reopened, the court shall either order a new trial or direct the entry of judgment, but no judgment shall be rendered by the court on the ground that the verdict is against the weight of the evidence.

{¶ 11} The standard for granting a motion for judgment notwithstanding the verdict is the same as that applicable to a motion for a directed verdict.[2] The evidence is construed most strongly in favor of the nonmovant, and the nonmovant is given the benefit of all reasonable inferences from the evidence.[3] Where there is substantial evidence to support the nonmovant's side of the case, upon which reasonable minds may reach different conclusions, the motion must be denied.[4] Conversely, the motion should be granted where the evidence is legally insufficient to support the verdict. Neither the weight of the evidence nor the credibility of the witnesses is before the court for determination.[5]

---

2. *Nickell v. Gonzalez* (1985), 17 Ohio St.3d 136, 137, 17 OBR 281, 477 N.E.2d 1145, citing *Ayers v. Woodard* (1957), 166 Ohio St. 138, 1 O.O.2d 377, 140 N.E.2d 401, paragraph one of the syllabus.

3. *Ruta v. Breckenridge–Remy Co.* (1982), 69 Ohio St.2d 66, 68, 23 O.O.3d 115, 430 N.E.2d 935.

4. *Nickell*, 17 Ohio St.3d at 137, 17 OBR 281, 477 N.E.2d 1145.

5. *Osler v. Lorain* (1986), 28 Ohio St.3d 345, 28 OBR 410, 504 N.E.2d 19.

## B. Arguments and analysis

{¶ 12} In this case, defendants [6] argue that there is insufficient evidence in the record to support verdicts against WHC on plaintiffs' intentional-infliction-of-emotional-distress and negligent-supervision claims. Defendants also argue that because there is insufficient evidence to support an independent tort claim against WHC, this court may not enter judgment against WHC in an amount greater than the judgment imposed against Mr. Vaughan. Defendants additionally argue that there is insufficient evidence in the record to support the imposition of punitive damages against WHC. Finally, defendants request that this court find that WHC cannot be vicariously liable for the punitive damages awarded against Mr. Vaughan because there is no evidence that WHC knowingly authorized or ratified Mr. Vaughan's battery of Andrew.

{¶ 13} This court attentively observed the presentation of evidence at trial. Defendants moved the court for directed verdict at the close of plaintiffs' case. This court had fully reviewed the transcript of plaintiffs' case in anticipation of defendants' motion for directed verdict. The court granted all of the parties an opportunity to address the motion orally. After carefully considering the parties' arguments and observing and reviewing the admissible evidence presented in plaintiffs' case, the court denied defendants' motion for directed verdict, finding that a reasonable juror could find in favor of plaintiffs on each essential element of each of their claims.

{¶ 14} In deciding defendants' motion for judgment notwithstanding the verdict, this court again has carefully reviewed the transcript of the proceedings, the exhibits admitted at trial, and the admissions contained in the pleadings. Based on its review of the evidence, and construing all evidence and reasonable inferences in favor of plaintiffs, the court finds that there is substantial evidence upon which reasonable minds could reach different conclusions on each of the essential elements of plaintiffs' claims for intentional infliction of emotional distress and negligent supervision. Similarly, the court finds that there is substantial evidence upon which reasonable minds could reach different conclusions as to the award of punitive damages against WHC.

{¶ 15} The court recognizes that the compensatory and punitive damages award against WHC exceeds the compensatory and punitive damages awarded against Mr. Vaughan. Had this case involved only respondeat superior claims, the court agrees that WHC, as principal, could not be liable for damages

---

6. Although the motion for judgment notwithstanding the verdict, new trial, and/or remittitur was filed by both Mr. Vaughan and WHC, the court notes that none of the arguments raised by defendants on their motion for judgment notwithstanding the verdict challenges the jury's verdict and award of compensatory and punitive damages against Mr. Vaughan.

greater than those awarded against its agent, Mr. Vaughan. However, plaintiffs asserted independent tort claims against WHC in addition to its respondeat superior claims. Plaintiffs' intentional-infliction-of-emotional-distress claim against WHC was based not only upon Mr. Vaughan's battery of Andrew but also upon WHC's actions subsequent to the battery.

{¶ 16} The court also recognizes that Interrogatory No. 2.A does not clearly identify whether the jury found that Mr. Vaughan, WHC, or both intentionally inflicted serious emotional distress on the Faietas. The interrogatory, signed by all eight jurors, provides that the jury found that "Richard Vaughan *and/or* World Harvest intentionally inflicted serious emotional distress on the Faietas." (Emphasis added.) Had defendants desired any further clarity regarding the precise mental processes of the jury, defendants could have submitted more precise interrogatories to the jury. However, defendants' own proposed jury interrogatories set forth the "and/or" language upon which defendants now base their inconclusiveness argument, and all of the parties agreed to the content and form of the interrogatories. Despite the alleged inconclusiveness regarding Interrogatory 2.A, the court finds that the jury entered a general verdict against WHC for plaintiffs. Because the jury entered a general verdict against WHC, this court must presume that the jury found against WHC on the intentional-infliction-of-emotional-distress claim.[7]

{¶ 17} Even if this court could not presume that the jury found against WHC on the intentional-infliction-of-emotional-distress claim, plaintiffs presented a second independent tort claim against WHC that would support a greater award against WHC than the award against Mr. Vaughan. The jury unanimously found for plaintiffs and against WHC on the negligent-supervision claim. Accordingly, the court cannot find that a judgment against WHC that exceeds the judgment against Mr. Vaughan must be set aside on a motion for judgment notwithstanding the verdict.

{¶ 18} Finally, the court finds that WHC is vicariously liable for the punitive damages awarded against Mr. Vaughan. R.C. 2315.21(C) provides:

Subject to division (E) of this section, punitive or exemplary damages are not recoverable from a defendant in question in a tort action unless both of the following apply:

(1) The actions or omissions of that defendant demonstrate malice or aggravated or egregious fraud, *or that defendant as principal or master knowingly*

---

7. *Hampel v. Food Ingredients Specialties* (2000), 89 Ohio St.3d 169, 185, 729 N.E.2d 726, citing *H.E. Culbertson Co. v. Warden* (1931), 123 Ohio St. 297, 303, 175 N.E. 205.

*authorized, participated in, or ratified actions or omissions of an agent or servant that so demonstrate.*

(2) The trier of fact has returned a verdict or has made a determination pursuant to division (B)(2) or (3) of this section of the total compensatory damages recoverable by the plaintiff from that defendant.

(Emphasis added.) Defendants assert that there is insufficient evidence in the record to establish that WHC knowingly authorized, participated in, or ratified the actions of Mr. Vaughan. In both its answer to the original complaint and its answer to the amended complaint, WHC admitted that Mr. Vaughan's actions are deemed to be the actions of WHC and that WHC is liable for the acts of Mr. Vaughan. While WHC denied that Mr. Vaughan's actions were wrongful, WHC did not limit its liability for Mr. Vaughan's actions in any way in the event that Mr. Vaughan's actions were found to have been wrongful. Because WHC admitted not once, but twice, that it was liable for the actions of Mr. Vaughan, plaintiffs did not prepare or present further evidence of WHC's liability for Mr. Vaughan's actions. The court finds that there is sufficient evidence in the record that WHC is vicariously liable for the damages awarded against Mr. Vaughan, including the punitive damages award.

## C. Conclusion

{¶ 19} For the foregoing reasons, defendants' motion for judgment notwithstanding the verdict is denied.

## IV. Motion for New Trial

### A. Standard of review

{¶ 20} Civ.R. 59(A) permits a new trial to be granted to a party on all or part of the issues based upon any one of nine enumerated grounds.[8] In this case, defendants seek a new trial based upon the grounds set forth in Civ.R. 59(A)(1),(4), (6), and (9).

{¶ 21} A trial court may grant a new trial pursuant to Civ.R. 59(A)(1) when there was "irregularity in the proceedings of the court, jury, * * * or prevailing party, or any order of the court * * *, or abuse of discretion, by which an aggrieved party was prevented from having a fair trial." Similarly, Civ.R. 59(A)(9) allows for a new trial for an "error of law occurring at the trial and brought to the attention of the trial court by the party making the application."

{¶ 22} When a verdict is influenced by passion or prejudice, a trial court may grant a new trial pursuant to Civ.R. 59(A)(4). In assessing whether the jury's

---

8. *See* Civ.R. 59(A)(1)–(9).

verdict was influenced by passion or prejudice, a court may consider the amount of the verdict and whether the jury considered incompetent evidence, improper argument by counsel, or other improper conduct.[9] The decision whether to grant a motion for new trial pursuant to Civ.R. 54(A)(4) rests within the discretion of the trial court and will not be disturbed on appeal absent an abuse of discretion.[10]

{¶ 23} Civ.R. 59(A)(6) also allows for a new trial when "the judgment is not sustained by the weight of the evidence." When considering a motion for a new trial pursuant to Civ.R. 59(A)(6), a court must weigh the evidence and pass on the credibility of the witnesses.[11] A new trial will not be granted where the verdict is supported by competent, substantial, and apparently credible evidence.[12] A trial court may not set aside a jury verdict upon the weight of the evidence based upon a mere difference of opinion with the jury.[13] Because a trial court is in the best position to decide issues of fact, it is vested with broad discretion in ruling upon motions for new trial based upon Civ.R. 59(A)(6).[14]

## B. Arguments and analysis

### 1. Jury was under the influence of passion or prejudice

■ {¶ 24} Defendants assert that the jury in this case was influenced improperly by passion or prejudice against WHC. In support of this assertion, defendants point to the jury's determination that Andrew was entitled to $600,000 in noneconomic damages from defendants and the jury's verdict of $5 million in punitive damages against WHC. Defendants argue that these damages are excessive and have no basis in the evidence. Additionally, defendants assert that the jury was influenced by passion and prejudice against WHC based on allegedly inflammatory and misleading statements made by plaintiffs' counsel in closing arguments.

{¶ 25} Upon review of the jury's determination of the noneconomic damages sustained by Andrew and the jury's punitive-damages award, this court cannot conclude that these awards demonstrate that the jury was influenced by passion or prejudice against WHC. An award of noneconomic damages is generally not

---

9. *Harris v. Mt. Sinai Med. Ctr.,* 116 Ohio St.3d 139, 2007-Ohio-5587, 876 N.E.2d 1201, at ¶ 4–14.

10. Id. at ¶ 35–36.

11. Id.; see also *Rohde v. Farmer* (1970), 23 Ohio St.2d 82, 91, 52 O.O.2d 376, 262 N.E.2d 685.

12. *Harris* at ¶ 35–36.

13. *Miller v. Paulson* (1994), 97 Ohio App.3d 217, 224, 646 N.E.2d 521.

14. See *Harris* at ¶ 36.

based upon a concrete dollar figure because such an award compensates a plaintiff for intangible injuries that are not subject to easy quantification. Similarly, an award of punitive damages is not meant to compensate a plaintiff for injury but to punish a defendant for wrongdoing. As a result, an award of punitive damages is not generally based upon specific evidence of a plaintiff's damages in the record.

{¶ 26} The court finds that there is nothing in the record to suggest that Andrew's noneconomic damages were excessive or based upon improper considerations. Furthermore, Interrogatory No. 6, which all eight jurors signed, found that the total amount of noneconomic damages sustained by Andrew was $600,000. Interrogatory No. 6 encompassed the noneconomic damages for Andrew based not only upon the claims against WHC but also upon the claims against Mr. Vaughan. Because the interrogatory, as agreed to by the parties, does not apportion Andrew's noneconomic damages by defendant or claim, the court cannot conclude from that award that the jury was in any way influenced by passion or prejudice against WHC.

{¶ 27} In addition, the court cannot conclude that the difference in the amounts of punitive damages awarded against WHC and Mr. Vaughan demonstrates that the jury was influenced by passion or prejudice against WHC. As the court has set forth above, this case involved multiple claims against WHC, some based upon respondeat superior and others based upon independent torts committed by WHC. Given the differences in the claims asserted against WHC and Mr. Vaughan, this court cannot conclude that a difference in the punitive damages awarded against each defendant demonstrates an improper influence of passion or prejudice against WHC.

{¶ 28} The court further finds that the closing argument of plaintiffs' counsel was not inflammatory, misleading, or otherwise improper. Counsel is afforded broad latitude in closing arguments.[15] Included within that broad latitude are reasonable inferences and deductions drawn from the evidence presented at trial.[16] However, the bounds of closing argument are not limitless.[17] A proper closing argument cannot present arguments that are not supported by the evidence.[18] The trial court is given discretion to determine whether closing

15. *Barnett v. Thornton,* Franklin App. No. 01AP–951, 2002-Ohio-3332, 2002 WL 1379059, ¶ 21.

16. Id.

17. Id. at ¶ 22.

18. Id. at ¶ 24.

arguments go beyond the bounds of permissible argument.[19]

{¶ 29} The court notes that at no time during plaintiffs' closing argument did defendants object. This court has reviewed plaintiffs' closing arguments and finds that while plaintiffs' counsel argued zealously, the closing arguments did not go beyond the bounds of permissible argument. Furthermore, the court observes that defendants have cited portions of plaintiffs' closing argument out of context in such a way as to create the appearance of impropriety. This court witnessed and heard the closing argument firsthand and has reviewed the transcript of the entirety of plaintiffs' closing argument. The court finds no impropriety in the closing arguments that would have inflamed the passion and prejudice of the jury against WHC.

{¶ 30} The jurors deliberated for over six hours. The court observed the demeanor of the jurors upon announcement of their verdict and after. The court observed nothing that would even suggest that any juror's verdict had been the result of improper passion or prejudice against WHC. Accordingly, the court finds that defendants are not entitled to a new trial pursuant to Civ.R. 59(A)(4).

### 2. Verdicts were against the manifest weight of the evidence

{¶ 31} Defendants also move for a new trial on all of the claims based on their assertions that the judgments are not sustained by the weight of the evidence. Specifically, defendants contend that the jury's verdicts of battery and intentional infliction of emotional distress against Mr. Vaughan were against the manifest weight of the evidence. Defendants also contend that the jury's verdicts against WHC for intentional infliction of emotional distress and negligent supervision were against the manifest weight of the evidence. For the reasons that follow, the court finds that the jury's verdicts against Mr. Vaughan and WHC are supported by competent, substantial, and credible evidence in the record.

{¶ 32} Defendants assert that the verdicts against Mr. Vaughan were against the manifest weight of the evidence because there was no competent and credible evidence in the record to demonstrate that Mr. Vaughan abused Andrew. Instead, defendants assert that all of the evidence demonstrates that the marks on Andrew's body were a form of contact dermatitis. Based upon the court's careful observation of the witnesses' testimony in this case and its review of the record, the court finds that there is competent, substantial, and credible evidence in the record that the marks on Andrew's body were caused by Mr. Vaughan's abuse and not contact dermatitis.

---

19. Id. at ¶ 22.

{¶ 33} The circumstantial evidence of the appearance of the marks on Andrew and the circumstances surrounding the discovery of the marks are consistent with a finding that Mr. Vaughan struck Andrew. Andrew had no marks on his body prior to being dropped off at Cuddle Care. There is no evidence that any other event occurred while Andrew was at Cuddle Care that would have caused the marks. Additionally, there is no evidence that Andrew was exposed to anything while at Cuddle Care that would have caused contact dermatitis. Andrew had no history of allergies, sensitive skin, or rashes. Andrew was potty trained, and therefore not susceptible to a rash or skin irritation from contact between a used diaper and his skin. There is no evidence that the marks were itchy or caused Andrew to scratch them. There is also no credible evidence in the record that any other child in the Cuddle Care program at that time experienced a similar skin irritation.

{¶ 34} The evidence describing the marks on Andrew's body both at the time they were discovered and as they healed also supports a finding that they were caused by abuse. Mr. Faieta, Ms. Faieta, Andrew's paternal grandmother Kathleen Faieta, and Andrew's aunt Melissa Vrable all testified regarding the appearance of the marks. The testimony described the marks as raised, red, welts, cuts, abrasions, frayed skin, and swollen. The marks were linear and were not consistent with the shape of anything else that might have caused Andrew to experience contact dermatitis. There is substantial and credible evidence in the record that Andrew experienced pain from the marks on his body when pressure was placed on those areas, although the emergency room records do not reflect that Andrew was in acute pain at the time of his visit. Furthermore, there is substantial and credible evidence that these marks turned to bruising before they healed.

{¶ 35} The conduct of the physicians that examined Andrew immediately after the incident weighs in favor of a finding of abuse. The emergency room physicians did not diagnose Andrew with contact dermatitis or any other skin condition or even suggest that the marks might have been the result of some skin irritation or allergy. They did not consult with or refer Andrew to a dermatologist. They did not prescribe any medication for contact dermatitis or any other skin condition. The emergency room physicians diagnosed the marks as suspected physical abuse and referred the matter for investigation.

{¶ 36} Based on the evidence regarding the nature of the marks on Andrew and other observations of the marks through personal examination or examination by photograph, several medical experts testified at trial that the marks were more consistent with abuse than contact dermatitis. The court heard testimony from Dr. Frasier, a highly qualified pediatrician who specializes in the area of evaluating child abuse and neglect. Dr. Frasier testified that it was her expert

opinion that the marks were a result of abuse and not contact dermatitis. Dr. Lin, a dermatologist who examined Andrew approximately one month after the incident and viewed photos of the marks taken right after their discovery, testified that if there was evidence of pain and bruising in connection with the marks, it was her expert medical opinion that the marks would be consistent with abuse rather than contact dermatitis. Defendants' medical expert, Dr. Scribano, initially testified that it was his expert opinion that the marks were consistent with some form of dermatitis. However, Dr. Scribano later expressed a lessened confidence in that opinion and similarly testified that if there were evidence of pain and bruising in connection with the marks, he would have concerns that the marks were caused by abuse.

{¶ 37} Andrew's statements and behavior following the incident also support a finding that Mr. Vaughan abused Andrew. Andrew's behavior at the time he was picked up from Cuddle Care was unusual and suggested that Andrew was experiencing some form of distress. Immediately after Mr. Faieta discovered the marks, Andrew was visibly upset and repeatedly stated that he could not explain where the marks came from because he would get in trouble. Andrew later made a spontaneous, unsolicited statement that he had been spanked by Mr. Vaughan with a knife. Additionally, there was testimony that following the incident, Andrew's personality changed and he became fearful of being separated from his parents and of being closed in rooms, particularly bathrooms. There was undisputed testimony from Dr. Diserio, Andrew's treating psychologist that Andrew was suffering from posttraumatic stress disorder because of a traumatic incident.

{¶ 38} Finally, the court finds that the testimony of Mr. Vaughan and Na'Koshia Banks regarding their earlier observations of marks on Andrew's body is inconsistent with the testimony of other witnesses. The court further finds that the testimony of Mr. Vaughan and Ms. Bank was inconsistent with each other. Therefore, the court finds the testimony not credible.

{¶ 39} Based on all of this evidence, the court concludes that the jury's determination that the marks on Andrew's body were a result of abuse by Mr. Vaughan and not dermatitis is supported by competent, substantial, and credible evidence. Therefore, the court will not overturn the jury's decision on this issue and will not grant defendants a new trial based on Civ.R. 59(A)(6).

{¶ 40} Defendants also assert that the verdict against WHC for intentional infliction of emotional distress was against the manifest weight of the evidence because there was no competent and credible evidence in the record to demonstrate that WHC committed any outrageous acts that caused serious emotional harm to plaintiffs. Based upon the court's careful observation of the witnesses' testimony in this case and its review of the record, the court finds that

there is competent, substantial, and credible evidence in the record to support the intentional infliction of emotional distress claim against WHC.

{¶ 41} There is substantial and credible evidence in the record to demonstrate that WHC committed acts that a jury could find to be outrageous. First, WHC admitted its liability for Mr. Vaughan's intentional infliction of emotional distress upon Andrew in connection with battery. Both of Andrew's parents, Andrew's extended family, and Dr. Diserio testified as to the extreme emotional distress suffered by Andrew because of the battery. Michael and Lacey Faieta also suffered serious emotional harm because of the battery of Andrew.

{¶ 42} Second, there is substantial and credible evidence in the record that after the battery, WHC engaged in a concerted effort to prevent plaintiffs from learning the cause of Andrew's injuries.

{¶ 43} After discovering the marks on Andrew, Michael and Lacey Faieta first spoke with Cathy Cornell, the director of the Cuddle Care program. The evidence demonstrates that Ms. Cornell informed the Faietas that she had already begun investigating the matter and that Mr. Vaughan had already stated that he had seen no marks on Andrew's body on January 17, 2006. However, the evidence presented at trial was unclear that Ms. Cornell had yet spoken to Mr. Vaughan at the time she spoke with the Faietas. Ms. Cornell provided no explanation about the cause of the marks.

{¶ 44} The Faietas also scheduled a meeting with the Cuddle Care director and teachers to discuss the marks on Andrew. Testimony by WHC's Human Resources Director, Beth Ann Gifford, repeatedly stressed that such an appointment through "the proper chain of command" would have been an appropriate method for the Faietas to address their concerns. Although Lacey Faieta attempted to speak with the headmaster regarding the incident, the headmaster refused to speak with her because he had been advised not to speak with the Faietas. The Faietas later cancelled the meeting with the Cuddle Care director and teachers upon the advice of Franklin County Children Services. The Faietas received no other communication from WHC regarding its investigation.

{¶ 45} WHC left the investigation of the marks to Ms. Gifford. Ms. Gifford's trial testimony and demeanor demonstrated that WHC's primary objective in investigating the marks was to protect itself and its employees rather than to conduct a good faith investigation. Despite the fact that its employees' versions of the events of January 17, 2006, were inconsistent, WHC summarily concluded that the marks were a rash. WHC made no efforts to obtain information relating to the marks from anyone other than its own employees until after this litigation had commenced.

{¶ 46} There is also substantial and credible evidence that WHC attempted to mischaracterize the marks on Andrew's body as a common rash. WHC and its agents asserted at trial that their communications with Cuddle Care parents about the appearance of rashes in Cuddle Care children were based upon the observation of such rashes on all of the children in Andrew's class. However, there is no credible evidence in the record that any of Andrew's classmates had suffered a rash similar to the marks on Andrew. Further, there is no evidence in the record that WHC ever identified the source of these "rashes" or took steps to prevent further outbreaks.

{¶ 47} Third, there is substantial and credible evidence in the record that after investigations were undertaken by the Faietas and other agencies, WHC sent the Faietas a letter ordering them not to come on the church's premises. The letter further threatened the Faietas that failure to comply with the order would result in WHC prosecuting them for trespass. The letter contained no exceptions and provided the Faietas with no means to schedule any further meetings with WHC employees in the proper "chain of command" identified by Ms. Gifford. The letter itself is evidence of an outrageous act that caused serious emotional harm to plaintiffs and is further evidence of WHC's concerted effort to prevent the Faietas from learning what had happened to Andrew on January 17, 2006.

{¶ 48} At trial, defendants attempted to establish that the Faietas had been requested to avoid WHC's premises because the Faietas had appeared on the property on January 18, 2006, and disrupted Cuddle Care teachers, administrators, and students. Defendants attempted to establish that the Faietas were on the premises in order to accuse WHC and its agents of wrongdoing. Defendants' attempts to suggest some impropriety on the part of the Faietas were unpersuasive. There is no evidence that the Faietas were disruptive at their initial meeting with Ms. Cornell or that they accused WHC or its employees of wrongdoing at that time. All of the evidence demonstrates that the Faietas were only seeking information that would help them identify the source of the marks on Andrew's body. As they were leaving, the Faietas spoke with Kendra Jones, one of the teachers of Andrew's Cuddle Care class. Ms. Jones testified that the Faietas only showed her the photographs taken of the marks and inquired whether she had an idea what might have caused them. Ms. Jones testified that the Faietas did not threaten or accuse her or anyone else of any wrongdoing. Lacey Faieta came to WHC and the Cuddle Care classroom one more time later that week to collect Andrew's things and remove him from the program. Again, there is no evidence of any kind that Ms. Faieta was disruptive on that visit.

{¶ 49} There is substantial and credible evidence that these actions of WHC caused the Faietas serious emotional distress. The serious emotional distress caused by WHC's actions was evident from the testimony of Michael and Lacey

Faieta and the testimony of their extended family. Lacey testified that the family had seen a therapist because of defendants' actions. In addition, although they were not directly her patients, Dr. Diserio testified that she also met with Michael and Lacey in connection with Andrew's therapy.

{¶ 50} Upon a careful review of all of the evidence, the court concludes that the jury's determination that WHC engaged in outrageous acts that caused serious emotional harm to plaintiffs is supported by competent, substantial, and credible evidence. Therefore, the court will not overturn the jury's decision on this issue.

{¶ 51} Finally, defendants assert that the verdict against WHC for negligent supervision was against the manifest weight of the evidence because there was no competent and credible evidence in the record to demonstrate that WHC knew or should have known of any propensity of Mr. Vaughan to abuse children. WHC only challenges the jury's finding that it knew or should have known of Mr. Vaughan's incompetence but does not challenge the jury's finding on the other elements of the negligent-supervision claim. Again, based upon the court's careful observation of the witnesses' testimony in this case and its review of the record, the court finds that there is competent, substantial, and credible evidence in the record that WHC knew or should have known of Mr. Vaughan's propensity to abuse or harm children entrusted to his care.

{¶ 52} There is credible evidence in the record that Mr. Vaughan was left alone to supervise the Cuddle Care class on only two occasions. On the first occasion, a child suffered a skull fracture. On the second occasion, Andrew Faieta was found to have suffered abuse to the front and back of his lower torso.

{¶ 53} There is substantial, competent, and credible evidence in the record that WHC knew of the skull fracture suffered by Zach Cochran and that WHC knew or should have known of the suspicious circumstances surrounding the injury. After Zach Cochran suffered a skull fracture while in Mr. Vaughan's sole care, Mr. Vaughan completed WHC's standard incident form and handwrote his brief explanation of the incident. Mr. Vaughan's report was given to WHC. Mr. Vaughan's testimony regarding the content of the standard incident form and handwritten summary contains no reasonable explanation as to how Zach Cochran would have sustained such a serious injury while playing with another toddler. Additionally, the other toddler sustained no injuries and that toddler's parents were not informed of the severity of the injury sustained by Zach Cochran.

{¶ 54} There is also competent, credible evidence in the record that Zach Cochran's mother reported the skull fracture to the WHC administration and requested documentation from WHC regarding its investigation of the incident. Such documentation was never provided. WHC's knowledge of the skull fracture and the seriousness of Zach Cochran's injuries is supported by the testimony of

Ms. Cornell, who testified that she had multiple telephone and e-mail conversations with Zach Cochran's mother, Crystal Cochran, regarding the injury. Ms. Cornell also testified that the Cuddle Care classrooms prepared a get-well poster for Zach Cochran, further evidencing WHC's knowledge of the injury.

{¶ 55} The evidence in the record demonstrates that, despite knowledge of the serious injury to Zach Cochran and the insufficient explanation regarding the incident provided by Mr. Vaughan, WHC conducted no investigation of the incident. WHC did not discuss the incident with Mr. Vaughan or provide him further training. Most importantly, WHC did not change its supervision of Mr. Vaughan.

{¶ 56} The testimony of WHC and its agents relating to the Zach Cochran incident was filled with inconsistencies that diminished the witnesses' credibility regarding that incident. Mr. Vaughan's trial testimony regarding the Zach Cochran incident was inconsistent both with previous accounts given by Mr. Vaughan and with the testimony of other witnesses. Ms. Cornell's testimony was contradicted by the testimony of other witnesses.

{¶ 57} Upon the court's review of all of this evidence, the court finds that the jury's determination that WHC had or should have had knowledge regarding Mr. Vaughan's incompetence is supported by competent, substantial, and credible evidence. Accordingly, the court will not overturn the jury's decision on this issue and will not grant defendants a new trial based on Civ.R. 59(A)(6).

### 3. Verdicts were a result of errors in the jury instructions

{¶ 58} Defendants further argue that the court should order a new trial pursuant to Civ.R. 59(A)(9) because of errors in the jury instructions. Defendants assert that this court erred by failing to give proper instructions regarding WHC's liability for the actions of Mr. Vaughan under the doctrine of respondeat superior. Defendants also assert that this court erred by failing to give proper instructions regarding WHC's liability for punitive damages based upon the actions of Mr. Vaughan. Although defendants present these alleged errors separately, the alleged errors are based upon the same underlying facts and the court will address them together.

{¶ 59} According to defendants, this court erred in finding that WHC's answer to the original complaint and answer to the amended complaint contained admissions regarding WHC's liability for the actions, including the intentional torts, of Mr. Vaughan. In the original complaint, plaintiffs alleged the following:

19. Defendant Vaughan assaulted, and committed a battery upon, Infant Doe.

20. The actions of defendant Vaughan were malicious and/or willful and/or wanton and/or displayed a reckless disregard for Infant Doe's welfare.

30. As an agent of Harvest School and/or World Harvest, defendant Vaughan's actions, including the wrongful actions as described in this Com-

plaint, are deemed to be the actions of defendant Harvest School and/or World Harvest.

31. Accordingly, defendant Harvest School and/or World Harvest is liable for the unlawful acts or omissions of its employee and/or its agent, defendant Vaughan.

In their answer to the original complaint, defendants stated the following:

19. Defendants deny the allegations state in Paragraph 19 of Plaintiff's Complaint.

20. Defendants deny the allegations stated in Paragraph 20 of Plaintiff's Complaint.

30. Defendants admit that Defendant Vaughan's actions are deemed to be the actions of Defendant World Harvest Preparatory School and or World Harvest. Defendants deny that any of Defendant Vaughan's actions were wrongful, and deny each and every allegation stated in Paragraph 30 of Plaintiff's Complaint not herein specifically admitted to be true.

31. Defendants admit that Defendant Harvest Preparatory School and or World Harvest is liable for the acts of its employee Defendant Vaughan. Defendants deny that any acts of Defendant Vaughan were unlawful, negligent, or otherwise actionable. The remaining allegations stated in Paragraph 31 of Plaintiff's Complaint are denied.

Similarly, in the amended complaint, plaintiffs alleged that:

28. At all times relevant hereto, defendant Vaughan was an employee and/or agent of defendant Harvest School and/or World Harvest and, therefore, an employee and/or agent of the company.

29. At all times relevant hereto, defendant Vaughan was acting within the scope of his agency with defendant Harvest School and/or World Harvest. To the extent defendant Vaughan was acting outside the scope of his agency, defendants have ratified his unlawful behavior by failing to address the matter and ordering plaintiffs to refrain from entering their property.

30. As an agent of Harvest School and/or World Harvest, defendant Vaughan's actions, including the wrongful actions as described in this Complaint, are deemed to be the actions of defendant Harvest School and/or World Harvest.

31. Accordingly, defendant Harvest School and/or World Harvest is liable for the unlawful acts or omissions of its employee and/or its agent, defendant Vaughan.

Defendants responded by stating:

29. Defendants admit the allegations in Paragraph 28 of Plaintiff's First Amended Complaint.

30. Defendants admit that at all alleged relevant times Defendant Vaughan was acting within the scope of his employment with Defendant·Harvest Preparatory School and/or World Harvest. The remaining allegations stated in Paragraph 29 of Plaintiff's First Amended Complaint are denied.

31. Defendants admit that Defendant Vaughan's actions are deemed to be the actions of Defendant Harvest Preparatory School and/or World Harvest. Defendants deny that any of Defendant Vaughan's actions were wrongful, and deny each and every allegation state in paragraph 30 of Plaintiff's First Amended Complaint not herein specifically admitted to be true.

32. Defendants admit that Defendant Harvest Preparatory School and/or World Harvest is liable for the acts of its employee Defendant Vaughan. Defendants deny that any acts of Defendant Vaughan were unlawful, negligent or otherwise actionable. The remaining allegations stated in paragraph 31 of Plaintiff's First Amended Complaint are denied.

{¶ 60} Defendants assert that the above admissions were merely admissions that Mr. Vaughan was acting in the course and scope of his employment at the time of the alleged battery and were not admissions of its liability for the actions of Mr. Vaughan. Therefore, defendants contend that this court was required to instruct the jury that in order to find WHC vicariously liable for the intentional torts of Mr. Vaughan, the jury would have to determine that Mr. Vaughan was acting in the scope and course of his employment and that his actions were calculated to facilitate or promote WHC's business or interest. Similarly, defendants contend that the court should have instructed the jury that it could not impose punitive damages against WHC based upon the actions of Mr. Vaughan unless they found that WHC knowingly authorized, participated in, or ratified his malicious actions.

{¶ 61} The court carefully considered defendants' arguments regarding their admissions at trial and in reviewing their motion for a new trial. The court finds defendants' arguments unpersuasive. Despite defendants' contentions to the contrary, defendants admitted more than just that Mr. Vaughan was acting within the scope of his employment with WHC at the times relevant to plaintiffs' complaint. Had defendants intended to admit only scope, defendants would not have admitted that Mr. Vaughan's actions are deemed to be the actions of WHC or that WHC is liable for the acts of Mr. Vaughan. Instead, WHC admitted that it was liable for the acts of Mr. Vaughan, including the alleged wrongful acts set forth in the complaint, and deemed them to be actions of WHC. The language of defendants' admissions is clear and unambiguous.

{¶ 62} Because WHC admitted its respondeat superior liability for Mr. Vaughan's actions, including his intentional torts, this court did not err in refusing to instruct the jury regarding respondeat superior liability and employer

liability for punitive damages arising out of the intentional torts of its employees. While defendants may now regret their apparently strategic decision to present a unified defense that the alleged battery never occurred, this regret cannot alter the clear and unambiguous admissions contained in defendants' answers to the original complaint and amended complaint. The court finds that defendants are not entitled to a new trial based on errors in the jury instructions.

### 4. Verdicts were a result of erroneous evidentiary rulings

{¶ 63} Finally, defendants assert that they are entitled to a new trial based on several evidentiary rulings made during trial. These alleged erroneous evidentiary rulings are as follows: (1) admissions of hearsay statements of Andrew, (2) exclusion of the content and conclusions of Franklin County Children Services ("FCCS") and Columbus Police Department ("CPD") investigations, (3) exclusion of a purported incident report detailing injury to Zach Cochran, and (4) admission of evidence of Mr. Vaughan's use of corporeal punishment with his own children. Upon a thorough review of the evidence, the court finds that these alleged evidentiary errors are without merit.

### a. Testimony regarding Andrew's statements

{¶ 64} Defendants argue that this court erred in permitting both Mr. Faieta and Dr. Diserio to testify regarding statements made by Andrew that Mr. Vaughan had hit him with an object. The court has reviewed these alleged errors and finds defendants' argument without merit.

{¶ 65} Andrew's statement that Mr. Vaughan had "spanked him with a knife" to his father on the way home on the day of the incident was an excited utterance that falls within the exception to the hearsay rule. The statement was made within several hours of the battery. From the time that Mr. Faieta had picked up Andrew until his statement in the car, the evidence in the record demonstrates that Andrew was upset, agitated, and acting uncharacteristically. Further, there is evidence that Andrew's statement was delivered in an uncharacteristic way, which further demonstrates his ongoing agitation and stress at the time the statement was made. In addition, despite defendants' assertions to the contrary, there is no evidence in the record to suggest that Mr. Faieta or anyone else suggested that the marks on Andrew were caused by Mr. Vaughan or someone else or were some type of abuse in Andrew's presence prior to his excited utterance. Accordingly, this court found that Andrew's statement was made while he was still under the stress of the battery in the classroom and that his statement was not a result of reflective thought. The court has reviewed the record and finds that Andrew's statement to Mr. Faieta was properly admitted as an excited utterance pursuant to Evid.R. 803(2).

{¶ 66} Additionally, the court finds that defendants waived their objection to Andrew's hearsay statement. Defendants did not object to Mr. Faieta testifying as to Andrew's hearsay statement regarding Mr. Vaughan spanking him with a knife. Defendants only objected to Mr. Faieta's testimony that Andrew said, "I can't tell you. I will get in trouble."

{¶ 67} As for Dr. Diserio's testimony regarding Andrew's statement that he had been spanked by Mr. Vaughan, the court finds that defendants filed a motion in limine seeking to exclude multiple topics from her trial testimony, including testimony regarding Andrew's statements during therapy. Prior to Dr. Diserio's testimony, the parties reached an agreement regarding the scope of her testimony. That agreement did not address her testimony regarding Andrew's statements. However, the court indicated that it would permit Dr. Diserio to testify as to Andrew's statements pursuant to Evid.R. 803(4). Defendants acknowledged that ruling and indicated their intention to note the objection during Dr. Diserio's testimony.

{¶ 68} The court also has reviewed Dr. Diserio's testimony and finds that her testimony about Andrew's statements made during therapy was properly admitted under Evid.R.803(4). Evid.R. 803(4) provides that statements "made for purposes of medical diagnosis or treatment and describing medical history, or past or present symptoms, pain, or sensations, or the inception or general character of the cause or external source thereof" are exceptions to the general rule against hearsay testimony. In this case, Andrew's statements regarding Mr. Vaughan's actions were made in connection with his psychological treatment with Dr. Diserio and stated the general character of the source of his need for treatment. Therefore, this court cannot conclude that it erred in allowing Dr. Diserio to testify as to Andrew's statements.

### b. FCCS and CPD investigations

{¶ 69} The court also finds that the content and conclusions of the FCCS and CPD investigations were properly excluded. The conclusions of these government agencies were irrelevant to the issues presented to the jury in this case. Government agencies have different purposes, consider different questions, and apply different standards to their investigations. Accordingly, to avoid juror confusion, the court precluded evidence of the content and conclusions of those investigations.

{¶ 70} The court notes that in their argument regarding this alleged evidentiary error, defendants assert that Andrew's statements were coerced. Although not relevant to the court's analysis of this alleged evidentiary error, the court finds it necessary to clarify that there is no evidence in the record that Andrew's statements were coerced, coached, or otherwise influenced by others.

### c. Zach Cochran incident report

{¶ 71} Defendants assert that the Zach Cochran incident report proffered into evidence by defendants should have been admitted as a business record pursuant to Evid.R. 803(6). Defendants further assert that the document was not hearsay because it was not offered to establish the truth of the matters contained in the report but to establish what WHC knew about the Zach Cochran incident.

{¶ 72} The court finds that the Zach Cochran incident report was properly excluded because it was not authenticated by any witness. Therefore, there was insufficient foundation established for defendants' Exhibit I to have been admitted into evidence as a business record. Although Mr. Vaughan testified that he prepared an incident report following Zach Cochran's injury, Mr. Vaughan testified defendants' Exhibit I was not the incident report he prepared. Mr. Vaughan testified that the words set forth in the report regarding the Zach Cochran incident were his words but that he did not type the summary that is the first page of the report. Because Mr. Vaughan did not prepare and could not identify the typewritten summary and no other witness could authenticate the document, the document was properly excluded. In addition, defendants did not identify at trial the alleged nonhearsay use for which they sought to admit Exhibit I or even argue that they intended to use the report for a nonhearsay use.

### d. Mr. Vaughan's use of corporeal punishment

{¶ 73} The court finds that Mr. Vaughan's testimony regarding the use of corporeal punishment was properly admitted. Mr. Vaughan's testimony did not constitute improper character evidence under Evid.R. 404(A) nor was the evidence unfairly prejudicial under Evid.R. 403. The court's in limine ruling excluding evidence of the Faietas' use of corporeal punishment with Andrew was proper because there was absolutely no evidence in the record to suggest that the Faietas caused the marks found on Andrew's body on January 17, 2006. Accordingly, the Faietas' use or nonuse of corporeal punishment was irrelevant to any issue in this case. Furthermore, defendants did not attempt to introduce any such evidence.

### C. Conclusion

{¶ 74} The court has considered all of the bases for new trial set forth by defendants. The court finds all of the arguments without merit. Accordingly, defendants' motion for new trial is denied.

## V. Application of R.C. 2315.18 and 2315.21

{¶ 75} Defendants move the court to apply the statutory caps on damages set forth in R.C. 2315.18 and 2315.21 to the jury's award of $600,000 in noneconomic damages to Andrew and to the jury's awards of punitive damages against WHC and Mr. Vaughan. In their initial briefing on the application of R.C. 2315.18 and 2315.21, plaintiffs raised constitutional challenges to those statutes. However, while these issues were pending before this court, the Ohio Supreme Court issued its decision in *Arbino v. Johnson & Johnson*,[20] in which it held R.C. 2315.18 and 2315.21 to be facially constitutional. Plaintiffs have conceded that *Arbino* renders their constitutional arguments regarding the application of R.C. 2315.18 and 2315.21 moot. Therefore, based on *Arbino*, this court is left with no alternative other than to apply R.C. 2315.18 and 2315.21 to the jury's award of noneconomic damages to Andrew and to the punitive-damages awards against Mr. Vaughan and WHC.

{¶ 76} Although *Arbino* rendered the constitutional analysis moot, the parties nevertheless disagree on the actual calculation of the capped awards based on the language of the statutes. The Supreme Court's decision in *Arbino* addressed only the facial constitutionality of R.C. 2315.18 and 2315.21 and did not address how those statutes are to be applied to actual jury awards.

### A. Andrew's noneconomic damages—R.C. 2315.18

{¶ 77} R.C. 2315.18 provides:

(B) In a tort action to recover damages for injury or loss to person or property, all of the following apply:

(1) There *shall not be any limitation on the amount of compensatory damages that represents the economic loss* of the person who is awarded the damages in the tort action.

(2) Except as otherwise provided in division (B)(3) of this section, the amount of compensatory damages that represents damages for *noneconomic loss* that is recoverable in a tort action under this section to recover damages for injury or loss to person or property *shall not exceed the greater of two hundred fifty thousand dollars or an amount that is equal to three times the economic loss, as determined by the trier of fact, of the plaintiff in that tort action to a maximum of three hundred fifty thousand dollars for each plaintiff* in that tort action or a maximum of five hundred thousand dollars for each occurrence that is the basis of that tort action.

\* \* \*

---

20. 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420.

(E)(1) After the trier of fact in a tort action to recover damages for injury or loss to person or property complies with division (D) of this section, the court shall enter a judgment in favor of the plaintiff for compensatory damages for economic loss in the amount determined pursuant to division (D)(2) of this section, and, subject to division (F)(1) of this section, the court shall enter a judgment in favor of the plaintiff for compensatory damages for noneconomic loss. Except as provided in division (B)(3) of this section, *in no event shall a judgment for compensatory damages for noneconomic loss exceed the maximum recoverable amount that represents damages for noneconomic loss as provided in division (B)(2) of this section.* Division (B) of this section shall be applied in a jury trial only after the jury has made its factual findings and determination as to the damages.

(Emphasis added.)

{¶ 78} In this case, the jury found that Andrew had suffered noneconomic damages of $600,000 and that Andrew had suffered no economic damages. Based on the jury's award of noneconomic damages, defendants assert that R.C. 2315.18 requires the court to enter judgment for Andrew on the noneconomic damages award for $250,000. Because the jury awarded Andrew no economic damages, defendants assert that Andrew is limited to $250,000 in accordance with R.C. 2315.18(B)(2).

{¶ 79} Plaintiffs argue that Andrew is entitled to noneconomic damages of $350,000 pursuant to R.C. 2315.18(B)(2). Plaintiffs arrive at this higher award by arguing that R.C. 2315.18 does not cap Andrew's noneconomic damages based on his own economic damages, but based on all of the economic damages awarded to all three plaintiffs. Michael and Lacey Faieta were awarded economic damages of $152,100. Plaintiffs argue that $152,100 in economic damages awarded to plaintiffs as a "family unit" should be multiplied by three but limited to $350,000 in accordance with R.C. 2315.18(B)(2), which sets $350,000 as the maximum amount of noneconomic damages recoverable by an individual plaintiff.

{¶ 80} The court finds plaintiffs' argument unpersuasive. R.C. 2315.18 provides that each plaintiff's noneconomic damages are calculated based on that same plaintiff's economic damages. R.C. 2315.18(A) provides that each plaintiff is entitled to the entirety of his or her own economic damages:

There shall not be any limitation on the amount of compensatory damages that represents the economic loss of *the person who is awarded the damages* in the tort action.

R.C. 2315.18(B) consistently and expressly uses the word "plaintiff" singularly in reference to the noneconomic damages limitation. There is no language in R.C. 2315.18 that would permit plaintiff A to use the economic damages of plaintiff B to calculate plaintiff A's noneconomic damages. Additionally, the Faieta "family

unit" was not a plaintiff to this action and there was no evidence presented regarding damages suffered by the "family unit." For these reasons, the court finds that R.C. 2315.18(B)(2) requires it to limit Andrew's noneconomic damages to $250,000.

## B. R.C. 2315.21

{¶ 81} Defendants move the court to apply R.C. 2315.21 to the punitive-damages awards against them. In this case, the jury awarded plaintiffs punitive damages against Mr. Vaughan of $100,000 and against WHC of $5 million. Defendants argue that the punitive-damages award against WHC must be reduced pursuant to R.C. 2315.21(D)(2)(a). Defendants further argue that R.C. 2315.21(D)(2)(b) should be applied to the punitive-damages award against Mr. Vaughan to reduce the award to zero. The court will address these arguments separately.

### 1. Punitive damages against WHC

{¶ 82} Defendants argue that R.C. 2315.21 requires the court to limit the punitive-damages award against WHC to $933,470, the amount that is two times the amount of the capped compensatory damages awarded to plaintiffs from WHC.

{¶ 83} R.C. 2315.21 provides:

(D)(1) In a tort action, the trier of fact shall determine the liability of any defendant for punitive or exemplary damages and the amount of those damages.

(2) Except as provided in division (D)(6) of this section, all of the following apply regarding any award of punitive or exemplary damages in a tort action:

(a) The court *shall not enter judgment for punitive or exemplary damages in excess of two times the amount of the compensatory damages awarded to the plaintiff from that defendant,* as determined pursuant to division (B)(2) or (3) of this section.

{¶ 84} Plaintiffs dispute defendants' calculation of the capped punitive-damages award against WHC. Plaintiffs assert that defendants' proposed capped punitive-damages award against WHC was calculated by multiplying the total capped compensatory damages awarded to plaintiffs by two. According to plaintiffs, R.C. 2315.21 requires that the capped punitive-damages award be determined by multiplying the total uncapped compensatory damages award by two. In this case, R.C. 2315.18 limits Andrew's noneconomic damages to $250,000 despite the jury's determination that Andrew sustained noneconomic injuries of $600,000. As a result, the difference between Andrew's capped and uncapped noneconomic

damages forms the basis for the dispute regarding the punitive-damages calculation.

{¶ 85} This court recognizes that the parties' dispute is the result of the poor and imprecise drafting of R.C. 2315.21(D)(2)(a). The provision does not explicitly state whether the punitive-damages limitation should be calculated based upon the total, uncapped compensatory damages awarded by the jury or upon the capped compensatory damages entered by the court pursuant to R.C. 2315.18(E)(1).[21] Instead, R.C. 2315.21(D)(2)(a) provides:

> The court shall not enter judgment for punitive or exemplary damages in excess of two times the amount of *the compensatory damages awarded to the plaintiff* from that defendant.

Accordingly, this court must interpret whether the legislature intended to limit punitive damages based upon the plaintiff's capped or uncapped compensatory damages. In order to determine legislative intent, a court must read words and phrases in context according to the rules of grammar and common usage.[22] A court may not add words not used or delete words used but must give effect to the statute as written.[23]

{¶ 86} Defendants contend that R.C. 2315.21(C)(2) defines the relevant compensatory damages as those determined by division (B)(2) and (3) of R.C. 2315.21. R.C. 2315.21(B)(2) provides:

> In a tort action that is tried to a jury and in which a plaintiff makes a claim for both compensatory damages and punitive or exemplary damages, the court shall instruct the jury to return, and the jury shall return, a general verdict and, if that verdict is in favor of the plaintiff, answers to an interrogatory that specifies the total compensatory damages *recoverable* by the plaintiff from each defendant.

Defendants argue that the use of the word "recoverable" in R.C. 2315.21(B)(2) and (3) [24] demonstrates that the punitive-damages award must be limited by using the capped compensatory damages because uncapped noneconomic damages are not "recoverable" as a matter of law.

{¶ 87} Defendants' argument rests entirely on its interpretation of "recoverable" as meaning only those compensatory damages that may be collected after

---

21. R.C. 2315.18(E)(1) provides, "[T]he court shall *enter a judgment* in favor of the plaintiff for compensatory damages for noneconomic loss."

22. *Davis v. Davis*, 115 Ohio St.3d 180, 2007-Ohio-5049, 873 N.E.2d 1305, ¶ 13.

23. Id.

24. R.C. 2315.21(B)(3) uses similar language but in the context of trials tried to the bench.

the imposition of the statutory caps. Unfortunately for defendants, the legislature used the terms "to recover" and "recoverable" in a far broader context throughout the tort-reform statutes. For example, R.C. 2315.21(B)(2) directs that a court instruct the jury that, if it returns a general verdict in favor of a plaintiff, it must specify in an interrogatory the total compensatory damages "recoverable" by the plaintiffs from each defendant. Because the legislature has explicitly indicated that a jury cannot be instructed regarding the existence of statutory caps on compensatory and punitive damages,[25] it would be entirely inconsistent with the substance of R.C. 2315.21(B)(2) to define "recoverable" damages as capped damages. Accordingly, this court cannot read the term "recoverable" to have the very narrow definition espoused by defendants.

{¶ 88} Not only does the court find defendants' argument unpersuasive, but the court also finds that R.C. 2315.21(B)(2) and (3) actually support plaintiffs' assertion that the uncapped compensatory damages must be used to calculate the capped punitive damages. Both R.C. 2315.21(B)(2) and (3) direct the fact-finder to make factual findings that specify the total compensatory damages to be awarded to the plaintiff from each defendant. Because the jury as fact-finder cannot be told of the statutory caps, the total compensatory damages referenced by R.C. 2315.21(B)(2) are the uncapped compensatory damages.

{¶ 89} In addition, contrary to defendants' assertions, there is nothing in R.C. 2315.18 that precludes a trial court, as fact-finder in a jury-waived trial, from finding that the plaintiff has sustained noneconomic damages in an amount that exceeds the statutory caps. The court is only precluded from entering judgment against a defendant in an amount that exceeds the caps set forth in the statute. Accordingly, R.C. 2315.21(B)(3) can be read consistently with (B)(2) to define the "total compensatory damages" as the uncapped compensatory damages.

{¶ 90} R.C. 2315.21(D)(2) specifically provides that the damages referenced in R.C. 2315.21(B)(2) and (3) are to be used to calculate the cap on punitive damages. Those provisions refer to the uncapped compensatory damages, and therefore this court finds that the uncapped compensatory damages must be used to calculate the cap on punitive damages.

{¶ 91} The court further finds that the language of R.C. 2315.21(D)(2)(a) supports a finding that the statutory cap on punitive damages must be calculated using a plaintiff's uncapped compensatory damages. R.C. 2315.21(D)(2)(a) provides that a court shall not enter judgment for punitive damages in excess of two times the amount of compensatory damages "awarded" to the plaintiff from defendant. Where a case has been tried to a jury, the trial court does not

---

25. See R.C. 2315.18(F)(2) and R.C. 2315.21(F).

"award" a plaintiff damages. The jury, as the trier of fact, awards a plaintiff the damages to which he or she is entitled based on the instructions of law given by the court. In applying the statutory caps to the jury's award of damages, the trial court merely enters judgment based upon the jury's factual findings of damages and the application of the statutory directives. This distinction between the jury as fact-finder that awards a plaintiff his or her total compensatory damages and the trial court as administrator that limits the effect of these factual findings as a matter of law was critical to the Supreme Court's analysis in *Arbino* that R.C. 2315.18 and 2315.21 do not violate the right to a jury trial.[26]

{¶ 92} Furthermore, this court finds that public policy weighs in favor of this interpretation of R.C. 2315.21(C)(2)(a). Statutory caps on damages apply in derogation of the damages found by the jury as trier of fact. Accordingly, statutes limiting the damages found by the jury should be interpreted as narrowly as possible. In this case, R.C. 2315.21(D)(2)(a) does not explicitly require this court to calculate the caps on the punitive damages using the capped compensatory damages. Instead, the language of R.C. 2315.21(D)(2)(a) and its surrounding context support this court's conclusion that the limits on punitive damages are to be calculated using the uncapped compensatory damages found by the jury. To the extent that the legislature wishes a different result, the legislature is capable of clarifying R.C. 2315.21(D)(2)(a).

{¶ 93} For these reasons, the court finds that plaintiffs are entitled to punitive damages from WHC of two times the total, uncapped compensatory damages awarded to plaintiffs from WHC. The jury awarded plaintiffs $764,235 against WHC. Therefore, the court finds that plaintiffs are entitled to punitive damages from WHC of $1,528,470.

### 2. Punitive damages against Mr. Vaughan

{¶ 94} Defendants argue that R.C. 2315.21(D)(2)(b) requires this court to enter judgment against Mr. Vaughan for the punitive damages awarded by the jury in the amount of $0. R.C. 2315.21(D)(2)(b) provides:

> *If the defendant is a[n]* * * * *individual,* the court shall not enter judgment for punitive or exemplary damages in excess of the lesser of two times the

---

**26.** *Arbino,* 116 Ohio St.3d 468, 2007-Ohio-6948, 880 N.E.2d 420, at ¶ 37, 40, 42 (holding that "[s]o long as the fact-finding process is not intruded upon and the resulting findings of fact are not ignored or replaced by another body's findings, awards may be altered *as a matter of law.* There is no dispute that the right to a trial by jury does not extend to the determination of questions of law. * * * Thus, without violating the Constitution, a court may apply the law to the facts determined by a jury. * * * Courts must simply apply the limits as a matter of law to the facts found by the jury; they do not alter the findings of facts themselves, thus avoiding constitutional conflicts. * * * Because R.C. 2315.18 follows these principles, it does not offend the right to a trial by jury under Section 5, Article I of the Ohio Constitution").

amount of the compensatory damages awarded to the plaintiff from the defendant or ten percent of the * * * individual's net worth when the tort was committed up to a maximum of three hundred fifty thousand dollars, as determined pursuant to division (B)(2) or (3) of this section.

(Emphasis added.) Defendants assert that there is no dispute that Mr. Vaughan is an individual and that R.C. 2315.21(D)(2)(b) is applicable. Defendants provide the sworn affidavit of Mr. Vaughan, testifying that at the time of the battery, he had a net worth of zero. Mr. Vaughan's affidavit also contains a copy of his 2005 tax return and copies of the ending balance of his banking accounts at the time of the battery.

{¶ 95} Plaintiffs contend that the time has passed for Mr. Vaughan to present evidence of his net worth at the time the tort was committed. According to plaintiffs, defendants should have presented evidence of Mr. Vaughan's net worth at trial so that the jury could determine Mr. Vaughan's net worth at the time of the battery. Plaintiffs further argue that WHC has admitted liability for Mr. Vaughan's actions, and therefore, WHC is jointly and severally liable for the $100,000 in punitive damages awarded against Mr. Vaughan. Because WHC is also liable for the $100,000 punitive-damages award, plaintiffs contend that Mr. Vaughan's personal assets are not at risk and that R.C. 2315.21(D)(2)(b) should not be applied.

{¶ 96} Upon review of R.C. 2315.21(D)(2)(b), the court finds that application of this poorly drafted provision is fraught with problems. First, the statute fails to define "net worth," leaving trial courts with a wide-ranging number of interpretations of that term. Second, R.C. 2315.21(D)(2)(b) provides no guidance as to how a defendant's net worth at the time of the commission of the tort is to be determined. The tort-reform statutes explicitly provide that juries are not to be instructed regarding the application of limits on their awards. As a result, the court cannot find that a defendant is required to raise the issue of his or her net worth at trial for the jury to determine that issue. However, the court finds that plaintiffs should be afforded some opportunity to question or rebut a defendant's self-serving assertions regarding his or her net worth. Additionally, the statute fails to address the effect of the reduction of one tortfeasor's punitive-damages liability on the liability of other tortfeasors where there is joint and several liability among tortfeasors.

{¶ 97} In this case, Mr. Vaughan asserts that he had no net worth in January 2006, the time of the battery. Because plaintiffs have not been afforded the opportunity to question Mr. Vaughan regarding the net-worth testimony he provided in his affidavit or to rebut Mr. Vaughan's testimony that he had no assets in January 2006, the court referred the limited issue of Mr. Vaughan's net worth to a magistrate of this court for hearing and determination. On May 5,

2008, the parties submitted a stipulation that Mr. Vaughan had no net worth at the time of the commission of the tort, and the magistrate's hearing was vacated. Accordingly, this court finds that R.C. 2315.21(D)(2)(b) requires it to enter judgment for punitive damages in favor of plaintiffs and against Mr. Vaughan for $0.

{¶ 98} Although the parties stipulated that Mr. Vaughan's relevant net worth was zero, plaintiffs continue to maintain that they are entitled to recover the $100,000 punitive damages award from WHC. This court already has found that WHC admitted liability for Mr. Vaughan's actions and WHC is jointly and severally liable for the damages awarded by the jury against Mr. Vaughan, including the punitive damages. WHC's liability for the amounts awarded against Mr. Vaughan is based on vicarious liability. Generally, a principal is vicariously liable for the acts of its agent only to the extent of the agent's liability. As a result, where an agent is not liable, the principal is also not liable.

{¶ 99} Relying on these general principles of agency law, WHC argues that if Mr. Vaughan is not required to pay the punitive-damages award as a result of R.C. 2315.21(D)(2)(b), it cannot be liable for that award as Mr. Vaughan's principal. However, application of R.C. 2315.21(D)(2)(b) to the punitive-damages award against Mr. Vaughan does not alter the jury's factual finding that he is liable for punitive damages [27] but merely requires this court to enter judgment against him in the amount of $0 for the punitive damages. R.C. 2315.21(D)(2)(b) in essence exempts Mr. Vaughan, an individual, from paying the punitive-damages award to plaintiffs, presumably in order to shield individuals and small business from punitive-damages liability greater than their financial ability to pay. The statute does not provide that other tortfeasors who are jointly and severally liable for the damages are also exempt from payment where those tortfeasors do not meet the requirements of R.C. 2315.21(D)(2)(b). [28]

{¶ 100} Like the general caps of punitive damages, R.C. 2315.21(D)(2)(b) applies in derogation of the damages found by the jury as trier of fact. This court must interpret the statute as narrowly as possible. Because R.C. 2315.21(D)(2)(b) does not alter the jury's factual determination that Mr. Vaughan is liable for punitive damages and because WHC is jointly and severally liable for those damages, the court concludes that WHC's liability for those damages is not extinguished by the application of the statute to Mr. Vaughan. To the extent

---

27. Again, the fact that the tort-reform statutes do not alter a jury's factual findings was critical to the Supreme Court's analysis in *Arbino* that those statutes do not violate the right to a jury trial.

28. WHC has not argued, or even suggested, that it falls within the definition of a "small employer" under R.C. 2315.21(D)(2)(b).

that the legislature wishes a different result, the legislature may amend R.C. 2315.21(D)(2)(b).

{¶ 101} Based on the application of R.C. 2315.21(D)(2)(b) to the punitive-damages award against Mr. Vaughan in this case, the court finds that judgment should be entered against him in the amount of $0 and against WHC in the amount of $100,000.

## VI. Motion for Remittitur pursuant to R.C. 2315.19

{¶ 102} Defendants also move the court to review the award of noneconomic damages to Andrew pursuant to R.C. 2315.19. According to defendants, the noneconomic damages awarded to Andrew are excessive, even when capped by R.C. 2315.18. R.C. 2315.19(A) provides:

Upon a post-judgment motion, a trial court in a tort action shall review the evidence supporting an award of compensatory damages for noneconomic loss that the defendant has challenged as excessive. That review shall include, but is not limited to, the following factors:

(1) Whether the evidence presented or the arguments of the attorneys resulted in one or more of the following events in the determination of an award of compensatory damages for noneconomic loss:

(a) It inflamed the passion or prejudice of the trier of fact.

(b) It resulted in the improper consideration of the wealth of the defendant.

(c) It resulted in the improper consideration of the misconduct of the defendant so as to punish the defendant improperly or in circumvention of the limitation on punitive or exemplary damages as provided in section 2315.21 of the Revised Code.

(2) Whether the verdict is in excess of verdicts involving comparable injuries to similarly situated plaintiffs;

(3) Whether there were any extraordinary circumstances in the record to account for an award of compensatory damages for noneconomic loss in excess of what was granted by courts to similarly situated plaintiffs, with consideration given to the type of injury, the severity of the injury, and the plaintiff's age at the time of the injury.

The trial court is required to set forth in writing its reasons for upholding the award of noneconomic damages.[29]

{¶ 103} Defendants assert that plaintiffs' counsel improperly inflamed the passion and prejudice of the jury against them. Defendants also assert that the jury view of the Cuddle Care classroom improperly permitted the jury to see the

---

29. R.C. 2315.19(B).

potential wealth of WHC, which formed the basis for the jury's excessive noneconomic damages award. Finally, defendants assert that the jury's determination of Andrew's noneconomic damages had no basis in the evidence.

{¶ 104} The court has carefully and completely reviewed the record in this case and finds that the award of noneconomic damages to Andrew, as capped by R.C. 2315.18, is not excessive. The court further finds that none of the factors set forth by R.C. 2315.19 weigh in favor of finding that the noneconomic damages award to Andrew was excessive.

{¶ 105} Contrary to defendants' assertions, there is simply no evidence that any evidence or arguments of plaintiff improperly inflamed the jury. There also is no evidence that the jury improperly considered the wealth of either defendant in determining the amount of noneconomic damages sustained by Andrew. The court notes that the jury view was necessitated in large part by defendants' theory of the case. Defendants' theory of the case rested upon their assertion that the marks on Andrew were the result of a rash that had been seen on his body prior to being left in the sole care of Mr. Vaughan. Defendants placed the issue of what could and could not be seen of the Cuddle Care bathroom from the Cuddle Care classroom directly in issue, and the jury view was a direct result of that argument.

{¶ 106} In addition, while there is not specifically quantifiable evidence in the record regarding the value of the noneconomic damages sustained by Andrew, noneconomic damages are by nature generally difficult to reduce to a specific dollar figure. The jury heard all of the evidence and was properly instructed regarding compensatory damages for noneconomic harm. Defendants did not object to these instructions at trial nor do defendants object to them now. The jury considered this evidence, applied the appropriate instructions, and found that Andrew suffered noneconomic damages of $600,000. The award has been significantly reduced by statute to $250,000. The court finds that there is no evidence to support defendants' assertions that this award of noneconomic damages is excessive.

{¶ 107} The court has considered all of the other factors set forth in R.C. 2315.19 and finds that none of those remaining factors demonstrate that the noneconomic damages awarded to Andrew are excessive. Defendants' motion to further reduce the noneconomic damages awarded to Andrew is denied.

## VII. Motion for Remittitur of Punitive Damages against WHC

{¶ 108} Defendants move the court to apply the doctrine of remittitur to the jury's punitive-damages award against WHC. In order to impose remittitur, this court must find that (1) unliquidated damages were assessed by the jury, (2) the verdict was not influenced by passion or prejudice, (3) the award is excessive,

and (4) plaintiffs agree to the reduction in damages.[30] Defendants assert that the punitive-damages award against WHC is excessive under federal and state law and should be reduced by this court.

{¶ 109} In analyzing defendants' remittitur arguments, this court first is presented with the question of whether its analyses should be based upon the jury's $5 million punitive-damages award or the capped punitive-damages award of $1,528,470 required because of R.C. 2315.21. Neither plaintiffs nor defendants have addressed this issue. Because the maximum punitive-damages award that this court can enter solely against WHC is $1,528,470, the court will analyze defendants' remittitur arguments based on this amount to determine whether the punitive damages award against WHC should be further reduced. For the reasons that follow, this court finds that it should not.

## A. Federal law

{¶ 110} The determination of whether a punitive-damages award violates the federal constitution is rooted in the Due Process Clause.[31] The United States Supreme Court has held that elementary notions of fairness dictate that parties receive fair notice not only of the conduct that will subject them to punishment but also of the severity of the penalty that may be imposed.[32] The United States Supreme Court has identified three guideposts to be used to determine whether a party has received adequate notice of the possible penalty and whether a punitive-damages award is unconstitutionally excessive. These guideposts are (1) the degree of reprehensibility of defendant's misconduct, (2) the disparity between the actual or potential harm suffered by the plaintiff and the punitive-damages award, and (3) the difference between the punitive damages awarded by the jury and the civil penalties authorized and imposed for comparable conduct.[33]

{¶ 111} Defendants argue that the first and second guideposts weigh in favor of finding the punitive damages awarded against WHC excessive under the federal constitution. Defendants concede that the third guidepost is of limited use to this case.

{¶ 112} In assessing the reprehensibility of a defendant's conduct, a court may consider the following factors: (1) whether the harm caused was

---

**30.** *Chester Park Co. v. Schulte* (1929), 120 Ohio St. 273, 166 N.E. 186, paragraph three of the syllabus.

**31.** *BMW of N. Am. v. Gore* (1996), 517 U.S. 559, 562, 116 S.Ct. 1589, 134 L.Ed.2d 809.

**32.** Id. at 574–575, 116 S.Ct. 1589, 134 L.Ed.2d 809.

**33.** Id.

physical as opposed to economic, (2) whether the conduct evinced an indifference to or a reckless disregard for the health or safety of others, (3) whether the target of the tortious conduct had financial vulnerability, (4) whether the conduct involved repeated actions or was an isolated incident, and (5) whether the harm was the result of intentional malice, trickery, or deceit, or mere accident.[34]

{¶ 113} This court cannot conclude that the reprehensibility guidepost demonstrates that the punitive-damages award against WHC is excessive. The harm caused by WHC's negligent supervision of Mr. Vaughan and its actions following the discovery of the marks on Andrew was not merely economic. The evidence in the record demonstrates that Andrew suffered physical and severe emotional harm because of WHC's actions. Michael and Lacey Faieta also suffered serious emotional harm because of WHC's actions. Further, WHC's conduct in failing to adequately supervise its employees, not thoroughly investigating injuries sustained by the children in its care, and engaging in a course of conduct designed to thwart efforts to identify potential child abuse evinced an indifference to or a reckless disregard for the health or safety of the children entrusted to WHC's care. There is also evidence in the record of WHC's previous failure to investigate serious injuries sustained by a child in the sole care of Mr. Vaughan. Accordingly, the actions that formed the basis of the punitive-damages award were not an isolated incident. Finally, there is evidence that WHC intentionally sought to "cover-up" this incident by barring the Faietas from further investigating the matter and by espousing and circulating a manufactured claim of rashes among Cuddle Care students to end any further inquiries into the incident.

{¶ 114} The court also finds that there is no significant disparity between the compensatory and punitive damages in this case. The jury found that plaintiffs were entitled to compensatory damages from WHC of $764,235, which has been somewhat reduced by R.C. 2315.18. Plaintiffs are entitled to recover punitive damages from WHC of $1,528,470. As a result, the punitive-damages award is slightly more than twice the compensatory damages awarded against WHC. The court cannot conclude that this disparity violates due process. This is particularly true given that R.C. 2315.21 specifically permits a plaintiff to recover punitive damages of two times the compensatory damages awarded by the jury, and *Arbino* held that this calculation of punitive damages does not violate either the federal or the state constitution.

{¶ 115} Based on its careful consideration of the evidence, the court finds that none of the due-process guideposts supports a finding that the $1,528,470

---

34. *State Farm Mut. Auto. Ins. Co. v. Campbell* (2003), 538 U.S. 408, 419, 123 S.Ct. 1513, 155 L.Ed.2d 585.

punitive-damages award violates the federal constitution. Therefore, the court declines to remit the award based on federal constitutional law.

## B. Ohio law

{¶ 116} While a punitive-damages award may not be grossly excessive under the federal constitution, a punitive-damages award may nevertheless violate Ohio law. The purpose of punitive damages is not to compensate a plaintiff but to punish and deter certain conduct. As a result, a punitive-damages award is more about a defendant's conduct than the plaintiff's loss. Under Ohio law, the focus of a punitive-damages award should be what it will take to bring about the goals of punishment and deterrence as to the particular defendant, and an award should go no further than necessary to achieve these goals.[35]

{¶ 117} In arguing that the punitive-damages award is excessive under Ohio law, defendants contend that the disparity between the punitive-damages awards against Mr. Vaughan and WHC demonstrates that the award against WHC is excessive and draconian. The jury awarded punitive damages against Mr. Vaughan of $100,000 and against WHC of $5 million.

{¶ 118} In reality, the disparity between the two punitive-damages awards demonstrates the jury's careful consideration of the purpose of punitive damages. The jury found that an award of $100,000 against Mr. Vaughan, an individual of apparently limited financial wealth by his own admission, was sufficient to punish Mr. Vaughan for his actions in abusing Andrew and to deter Mr. Vaughan from abusing another child entrusted to his care. Therefore, the jury awarded an amount no greater than it deemed necessary to punish Mr. Vaughan and to deter him from future similar conduct. As for WHC, a large entity with greater financial wealth, the jury found that $5 million in punitive damages was necessary to punish WHC for its reprehensible conduct in this case and to deter WHC from similar reprehensible conduct in the future. This court concurs with the jury that a disparity between the punitive-damages awards against Mr. Vaughan and WHC is not only appropriate but also required based upon the purpose of such damages.

{¶ 119} As this court has previously noted, R.C. 2315.21 has reduced the jury's $5 million punitive-damages award against WHC significantly. By enacting R.C. 2315.21, the Ohio legislature has set forth its tacit approval that a punitive-damages award of twice the compensatory damages is reasonable and sufficient to accomplish the twin goals of punishment and deterrence. The Ohio Supreme Court has also demonstrated its approval of such a punitive-damages award by

---

35. *See Dardinger v. Anthem Blue Cross & Blue Shield,* 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, ¶ 178.

upholding R.C. 2315.21 in *Arbino*. Given the enactment and affirmance of R.C. 2315.21, it may now be a rare case where a capped punitive-damages award is viewed as excessive under Ohio law.

{¶ 120} The court has reviewed the capped punitive-damages award in this case and concludes that the award does not violate Ohio law. The award is limited to the amount necessary to punish WHC for its reprehensible conduct in this case and to deter WHC from similar future conduct.

## C. Conclusion

{¶ 121} The court finds that the $1,528,470 punitive-damages award against WHC is not excessive under federal or state law. Accordingly, the court finds that remittitur is not required or appropriate. Defendants' motion for remittitur is denied.

{¶ 122} The court notes WHC's suggestion that plaintiffs should be required to submit the punitive-damages award to a relevant charity in accordance with the Ohio Supreme Court's decision in *Dardinger*.[36] Like the dissenters in *Dardinger*, this court has serious doubts regarding the wisdom of a court-imposed alternative distribution system for punitive damages. As stated by Chief Justice Moyer, "[T]he legislative branch is better equipped to establish a uniform mechanism for alternative distribution, thereby controlling judicial discretion and—in states authorizing the distribution of punitive damages to a general state fund—eliminating any inequity among potential recipients."[37]

{¶ 123} Furthermore, the relevant facts and applicable law at issue in *Dardinger* are vastly different from the facts and law before this court. *Dardinger* involved an initial punitive-damages award of $49 million, which was later remitted to $30 million—more than 19 times the final punitive-damages award against WHC and one of the largest punitive-damages awards in Ohio history. Significantly, at the time *Dardinger* was decided, there was no tort-reform statute limiting the total punitive damages that could be entered for a plaintiff. Had a tort-reform statute such as R.C. 2315.21 been in effect at the time of *Dardinger*, it is unclear whether the Supreme Court would have engaged in the same judicial tinkering with the punitive-damages award in that case. In the absence of the extraordinary facts at issue in *Dardinger*, a court-imposed alternative distribution of punitive damages is even less acceptable, particularly

---

**36.** 98 Ohio St.3d 77, 2002-Ohio-7113, 781 N.E.2d 121, at ¶ 189–190 (ordering that two-thirds of a $30 million punitive-damages award be given to a relevant charity).

**37.** Id. at ¶ 200.

where plaintiffs' punitive damages have already been reduced by statute by approximately two-thirds of the jury's award.

{¶ 124} While the court commends defendants' interest in charitable contributions to nonprofit organizations that combat child abuse, the court declines to require plaintiffs to allocate their punitive-damages award to a charity selected by defendants or this court. Should plaintiffs choose to donate their punitive-damages award, that act would be laudable. That is their decision to make. The court notes that plaintiffs' punitive-damages award was significantly reduced by statute. This large savings to WHC is analogous to the punitive damages that were ordered to be paid to charity in *Dardinger*. Perhaps WHC should donate these savings to charity, a voluntary gesture that would be much more appropriate than to require plaintiffs to donate the portion of the punitive-damages award that remains after the statutory cap is applied. Although plaintiffs may have some suggestions regarding an appropriate charity, the court declines to participate.

## VIII. Motion for Prejudgment Interest

### A. Standard of review

{¶ 125} R.C. 1343.03(C)(1) provides:

If, upon motion of any party to a civil action that is based on tortious conduct, that has not been settled by agreement of the parties, and in which the court has rendered a judgment, decree, or order for the payment of money, the court determines at a hearing held subsequent to the verdict or decision in the action that the party required to pay the money failed to make a good faith effort to settle the case and that the party to whom the money is to be paid did not fail to make a good faith effort to settle the case, interest on the judgment, decree, or order shall be computed as follows:

* * *

(b) In an action in which the party required to pay the money engaged in the conduct resulting in liability with the deliberate purpose of causing harm to the party to whom the money is to be paid, from the date the cause of action accrued to the date on which the order, judgment, or decree was rendered.

The purpose of R.C. 1343.03(C) is to encourage litigants to make a good faith effort to settle their case, thereby conserving legal resources and promoting judicial economy.[38]

---

38. *Viox v. Weinberg*, 169 Ohio App.3d 79, 2006-Ohio-5075, 861 N.E.2d 909, ¶ 45.

{¶ 126} For the purposes of R.C. 1343.03(C), a party may have failed to make a good faith effort to settle even when it has not acted in bad faith.[39] A party acts in good faith under R.C. 1343.03(C) if it fully cooperates in discovery proceedings, rationally evaluates its risks and potential liability, does not unnecessarily delay the proceedings, and makes a good faith monetary settlement offer or responds in good faith to a settlement demand from the plaintiff.[40] The burden of proof is on the party seeking prejudgment interest.[41]

## B. Arguments and analysis

{¶ 127} Plaintiffs move the court for an award of prejudgment interest against Mr. Vaughan and WHC from the dates on which the causes of action against them accrued. Plaintiffs assert that they made a good faith effort to settle this case with defendants prior to trial. Plaintiffs do not allege that defendants failed to cooperate in discovery proceedings or unnecessarily delayed these proceedings. However, plaintiffs assert that defendants failed to evaluate their risks and potential liability rationally and failed to make a good faith monetary settlement offer or respond in good faith to their settlement demand.

{¶ 128} In response, defendants present several arguments in support of their position that plaintiffs are not entitled to prejudgment interest under R.C. 1343.03(C). First, defendants assert that they rationally evaluated their risks and potential liability although that evaluation ultimately proved to be incorrect. Second, defendants assert that they made a good faith offer to settle this case on September 24, 2007, in response to plaintiffs' June 11, 2007 demand when they agreed to all of nonmonetary terms of the demand and offered $15,000 in response to plaintiffs' monetary demand. Defendants further assert that they continued to make good faith efforts to settle by attempting to schedule mediation and by increasing their monetary offer to $25,000 shortly before trial. Third, defendants assert that plaintiffs did not make a good faith effort to settle this case by failing to participate in mediation and by failing to lower their monetary demand in response to defendants' two monetary offers. Finally, defendants argue that the court cannot award prejudgment interest on future damages pursuant to R.C. 1343.03(C)(2). Because the jury in this case did not specify the amount of compensatory damages awarded for past damages, defendants assert that this court cannot determine the specific amount on which to award prejudgment interest.

---

**39.** *Kalain v. Smith* (1986), 25 Ohio St.3d 157, 159, 25 OBR 201, 495 N.E.2d 572.

**40.** Id.

**41.** *Moskovitz v. Mt. Sinai Med. Ctr.* (1994), 69 Ohio St.3d 638, 659, 635 N.E.2d 331.

{¶ 129} Based upon the evidence and arguments set forth in the parties' briefing and at the evidentiary hearing, the court cannot conclude that defendants failed to make a good faith effort to settle this case. Defendants initiated the settlement discussions between the parties by requesting a written settlement demand in May 2007. Plaintiffs provided a written settlement demand, and defendants responded, indicating their agreement to all of plaintiffs' nonmonetary settlement demands, demands plaintiffs had designated as of primary importance to them, and offering a comparatively small monetary sum. The evidence demonstrates that this small sum was the starting place for defendants' negotiations and that defendants were willing to continue negotiating the monetary component of the settlement. Defendants also attempted to schedule a mediation conference with plaintiffs although mediation ultimately did not occur due to scheduling difficulties. Closer to trial, defendants modestly increased the monetary component of their settlement offer and continued to express their agreement to all of the nonmonetary settlement demands made by plaintiffs. All of these efforts evidence a good faith attempt to settle the case by defendants.

{¶ 130} The court recognizes that WHC's insurer on WHC's behalf, reflecting the insurer's analysis of insurance coverage issues and its own analysis of the merits of the case, made the relatively small monetary offers. The court further recognizes that despite potential insurance-coverage issues, WHC did not offer to increase the monetary component of the settlement offer with any of its own funds. While it is unclear whether that decision reflects a rational evaluation of WHC's risks in potential future litigation with its insurer, this court cannot separate the actions of WHC and its insurer for the purposes of this motion. Accordingly, WHC receives the benefit of its insurer's actions on its behalf, and the insurer's monetary offers, coupled with WHC nonmonetary settlement offers, are sufficient to demonstrate a good faith attempt to settle.

{¶ 131} The court's finding that defendants made a good faith effort to settle the case in no way suggests that plaintiffs failed to make a good faith effort to settle. Plaintiffs clearly made good faith efforts to resolve this case prior to trial. While perhaps all of the parties could have pursued settlement more aggressively, the court finds that the settlement of all of the parties demonstrates good faith.

{¶ 132} Based upon the evidence before the court, the court also cannot conclude that defendants failed to evaluate their risks and liabilities rationally. Defendants presented evidence of the evaluation of the case by several attorneys who participated in this case in various capacities. All of these evaluations set forth factors that these attorneys believed, based on their extensive litigation experience, would weigh in favor of a defense verdict at trial. These evaluations also included considerations of the factors that weighed in favor of plaintiffs.

Based on these evaluations, the attorneys all concluded prior to trial that a trial would likely result in a defense verdict. These evaluations were communicated and explained to defendants. While these evaluations ultimately were incorrect, the court cannot conclude that defendants failed to evaluate their risks and liabilities rationally based on the information available to them prior to the start of trial.

## C. Conclusion

{¶ 133} For these reasons, the court finds that plaintiffs are not entitled to prejudgment interest pursuant to R.C. 1343.03. Plaintiffs' motion for prejudgment interest is denied.

## IX. Award of Attorney Fees

### A. Standard of review

 {¶ 134} A trial court may award attorney fees to a plaintiff who prevails on a claim for punitive damages. The appropriate amount of attorney fees to award in a given case rests in the sound discretion of the trial court. In determining an amount of fees to award, the court must first compute the "lodestar" figure, the number of hours expended multiplied by a reasonable hourly rate.[42] Once a court calculates the lodestar figure, the court may modify that calculation by the application of the factors set forth in DR 2–106.[43] Those factors are:

1. The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;

2. The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;

3. The fee customarily charged in the locality for similar legal services;

4. The amount involved and the results obtained;

5. The time limitations imposed by the client or by the circumstances;

6. The nature and length of the professional relationship with the client;

---

42. *Landmark Disposal, Ltd. v. Byler Flea Mkt.*, 5th Dist. Nos. 2005CA00291 and 2005CA00294, 2006-Ohio-3935, 2006 WL 2141575, ¶ 13.

43. Id. at ¶ 14; see also *Bittner v. Tri–Cty. Toyota, Inc.* (1991), 58 Ohio St.3d 143, 569 N.E.2d 464. The Code of Professional Responsibility was replaced by the Rules of Professional Conduct on February 1, 2007. However, the Rules of Professional Conduct are not retroactive, and therefore, the Code of Professional Responsibility applies to this case. The court notes that the factors for determining a reasonable fee are the same in both the Code of Professional Conduct and the Rules of Professional Conduct.

7. The experience, reputation, and ability of the lawyer or lawyers performing the services; and

8. Whether the fee is fixed or contingent.

If a court deviates from the lodestar figure, the court must provide a clear explanation of the basis for its decision.[44]

## B. Arguments and analysis

{¶ 135} Plaintiffs move the court to find that they are entitled to recover from WHC the reasonable attorney fees that they incurred in connection with prosecuting this matter. In this case, plaintiffs' request is supported by a jury's award. Specifically, plaintiffs seek an award of attorney fees that approximates the one-third contingent-fee agreement that they entered with their law firm, Cooper and Elliott.[45] The undisputed evidence before the court demonstrates that Cooper and Elliott provided 1,192.25 hours of service to plaintiffs, exclusive of the time spent by Cooper and Elliott at the attorney fee hearing. The undisputed evidence further demonstrates that Charles Cooper and Rex Elliott, the partners of the Cooper and Elliott firm, bill at the rate of $300 per hour and that all other Cooper and Elliott associates bill at the rate of $225 per hour. Both in their prehearing brief and at the attorney-fee hearing, plaintiffs presented evidence and argument to support their assertion that the DR 2–106 factors weigh in favor of awarding them attorney fees that approximate the one-third contingent-fee agreement.

{¶ 136} Defendants assert that this court should exercise its discretion to decline to award plaintiffs any attorney fees. According to defendants, plaintiffs will be compensated more than adequately by the damages awarded by the jury and an award of attorney fees is unnecessary to compensate plaintiffs fully. Defendants further argue that if the court finds that an award of attorney fees is appropriate, the court should not enhance the lodestar amount either by plaintiffs' contingent-fee agreement or by some other multiplier.

{¶ 137} The jury concluded that plaintiffs are entitled to recover their reasonable fees from WHC. The court finds that an award of reasonable attorney fees to plaintiffs from WHC is appropriate, and the court will not exercise its discretion to decline to award attorney fees. The court recognizes that R.C. 2315.21 specifically contemplates that attorney fees may be awarded against a

---

44. *Landmark* at ¶ 13.

45. At the attorney-fee hearing, defendants initially argued that the one-third contingent-fee agreement was not binding as to Andrew due to alleged deficiencies in following probate court rules for the approval of attorney-fee agreements for minors. Defendants withdrew this argument prior to the conclusion of the attorney-fee hearing, and therefore, the court declines to address these arguments further.

defendant who has been found to be liable for punitive damages even when the punitive-damages award is subject to the caps set forth in R.C. 2315.21(D)(2). R.C. 2315.21(D)(2)(c) provides, "Any attorney fees awarded as a result of a claim for punitive or exemplary damages shall not be considered for purposes of determining the cap on punitive damages." Accordingly, this court cannot conclude that the punitive-damages award is adequate to serve as a deterrent and to compensate plaintiffs as defendants suggest.

{¶ 138} Defendants concede that Cooper and Elliott's hourly rates are reasonable, and with the exception of approximately $25,000 worth of hours billed, defendants concede the necessity of the hours expended by Cooper and Elliott on the case. The hours challenged by defendants fall into three general categories: (1) allegedly duplicative hours billed by Cooper and Elliott's associate, Sheila Vitale, (2) hours spent pursuing criminal prosecution of Mr. Vaughan, and (3) hours spent by Cooper and Elliott with the media following the verdict.

{¶ 139} The court cannot conclude that Cooper and Elliott's practice of having Ms. Vitale attend depositions and trial with the Cooper and Elliott partners is excessive, duplicative, or unnecessary. The evidence presented at the attorney-fee hearing demonstrates that due to the schedules of the Cooper and Elliott partners and associates, Cooper and Elliott originally intended that Ms. Vitale would second chair the trial of this case and that Ms. Vitale worked extensively on the case. Based on her extensive work, Ms. Vitale had great knowledge regarding the legal and factual issues involved and great familiarity with many of the witnesses. As a result, her perceptions of witness testimony at depositions and trial contributed to plaintiffs' prosecution of the case. The court therefore finds that the evidence in the record demonstrates that the hours billed by Ms. Vitale were not unreasonable or unnecessary.

{¶ 140} The court notes that defendants frequently had multiple lawyers attending depositions, trial, and other hearings on their behalf. At trial, three lawyers represented defendants at counsel table. At the attorney-fee hearing, defendants had three lawyers at counsel table plus at least one other lawyer in the gallery throughout the entire hearing. Accordingly, the court cannot find that the use of multiple lawyers for plaintiffs at various stages of this litigation should not be included in calculating the lodestar amount.

{¶ 141} Similarly, the court cannot conclude that the hours relating to plaintiffs' pursuit of a criminal prosecution of Mr. Vaughan were unnecessary or unrelated to this case. As an initial matter, the court notes that the time entries objected to by defendants do not demonstrate that those hours relate to the criminal investigation as clearly as defendants would like this court to believe. A review of these entries reveals that those hours referred to the criminal investiga-

tion, but also often reflected work directly on the civil case. For example, on August 6, 2007, two hours of work were billed for the following:

> Review deposition of Detective Franks and draft letter to Detective Franks regarding Dr. Scribano's new opinion. Telephone conference with Mrs. Faieta regarding the status of the case.

Given the related nature of the criminal investigation and the litigation of this case, this court cannot conclude that time entries that include reference to the criminal investigation reflect work by Cooper and Elliott that is irrelevant to this action.

{¶ 142} Finally, with one limited exception, the court cannot conclude that hours objected to by defendants for time spent on media matters were unnecessary. Like the time entries relating to the criminal investigation, the "media" entries also reflect work directly on the case in addition to time relating to the media. The October 19, 2007 entry reflects that five and a half hours were billed for the following:

> Address issues following the jury's verdict, including inquiries from the press in response to Mr. Saxbe's comments.

While some time was clearly spent in relation to the media, this entry reflects that Cooper and Elliott engaged in other non-media-related work during that time. There is nothing before the court that would enable it to determine what portion of the work related to the objectionable "media" work and what portion relates to other work on the case.

{¶ 143} The court also notes that the two "media" time entries for October 19 and 24, 2007, that defendants find objectionable clearly set forth that they were billed in response to media inquiries regarding statements made *by defendants* to the media. There is no evidence in the record that plaintiffs sought out the media contact reflected in those entries. Accordingly, the court will include those hours in calculating the lodestar amount. However, Cooper and Elliott billed one hour for time spent on a media interview of plaintiffs. Because that time clearly was unnecessary to the litigation of the case, the court will exclude from the lodestar amount calculation the one hour of time Ms. Vitale spent on October 19, 2007, representing plaintiffs during a media interview.

{¶ 144} For the foregoing reasons, the court finds that Cooper and Elliott necessarily expended 1,191.25 hours in litigating this case prior to the attorney-fee and prejudgment-interest hearing on February 27 and 29, 2008. Multiplying those hours by Cooper and Elliott's reasonable hourly rates, the court finds that the lodestar amount, exclusive of the additional hours spent at the February 2008 hearing, is $329,081.25. The court further finds that Cooper and Elliott expended an additional 13 hours of work at the attorney-fee and prejudgment-interest

hearing, ten hours for Mr. Cooper and three hours for Mr. Elliott. Therefore, including these hours, the court finds that the lodestar amount is $332,981.25.

{¶ 145} Based on the lodestar amount, the court must determine whether to reduce or enhance that amount based upon the DR 2–106 factors. After careful consideration of those factors, the court concludes that several factors weigh in favor of enhancing the lodestar amount.

- **The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly**

{¶ 146} This case required extensive time and labor to bring it to trial approximately 16 months after its filing. The case required the depositions of 20 potential witnesses, including depositions out of state. Twenty-six witnesses testified at a trial that lasted eight days. The posttrial work has been similarly extensive.

{¶ 147} The case involved unusual and complex legal and factual issues. Civil cases regarding alleged child abuse are rare and present unique challenges, particularly where the child, like Andrew, is very young. In this case, the primary question—whether or not Andrew was abused by Mr. Vaughan—was vigorously disputed with some evidence supporting both plaintiffs' and defendants' views of events. The related criminal and FCCS investigations presented additional factual and legal issues, especially since neither of those investigations resulted in a finding of abuse. Further complicating the case was the status of defendants as a church and church employee. As a result, this case presented challenges unusual to typical tort litigation.

{¶ 148} The court finds that the skills needed to persuade the jury to find in favor of plaintiffs were substantial, particularly given some of the unique legal and factual challenges presented by this case. The case required plaintiffs' counsel to make strategic decisions regarding these unique challenges, and extensive litigation skills and experience were needed to make those strategic decisions. In addition, given the nature of the primary factual dispute, plaintiffs' counsel were required to skillfully and carefully cross-examine defendants' witnesses to identify the weaknesses and inconsistencies in their testimony while remaining respectful and diplomatic so as not to offend or alienate the jury. Successful and credible presentation of plaintiffs' theory of the case to the jury required skillful witness preparation and direct examination. The case also involved several medical experts, and two of those witnesses, including one of plaintiffs' expert witnesses, expressed some doubt in their initial opinions at some point in the litigation. The ability to address those experts' doubts in a way that most benefited plaintiffs' case took great skill.

- **The experience, reputation, and ability of the lawyer or lawyers performing the services**

{¶ 149} This court cannot stress enough the high caliber and professionalism of all of the counsel that participated in this case. Both plaintiffs' and defendants' lawyers and their respective law firms are well known for their experience and excellent abilities in the area of litigation. Plaintiffs' counsel have extensive experience in trying difficult and challenging cases and in obtaining substantial verdicts for their clients. Likewise, defendants' counsel are highly experienced and successful. The experience, reputation, and abilities of defendants' counsel presented plaintiffs with further challenges in this litigation.

- **The fee customarily charged in the locality for similar legal services**

{¶ 150} Unusual or complex tort cases such as this one frequently are taken by contingent-fee agreement. The contingent-fee agreement between plaintiffs and Cooper and Elliott falls squarely within the typical percentage of recovery sought by other plaintiff lawyers in contingency fee cases. However, there is also undisputed evidence before the court that Cooper and Elliott would have charged plaintiffs $300 per hour for its partners and $225 per hour for its associates if this case had been taken as an hourly fee case. The court heard testimony from plaintiffs' expert witness Michael Rourke that Cooper and Elliott's hourly rates are reasonable, but comparatively low for the experience, reputation, and abilities of the law firm's attorneys.

- **The amount involved and the results obtained**

{¶ 151} Plaintiffs sought compensatory damages for medical expenses, lost wages, future lost wages, and noneconomic harm because of the actions of defendants. At the time of trial, plaintiffs' claimed economic damages of approximately $155,000. The noneconomic damages suffered by plaintiffs, although difficult to quantify, were the primary damages sought by plaintiffs. One of the defense counsel testified at the attorney-fee and prejudgment-interest hearing that he believed that a verdict against defendants would be substantial in the event that defendants were unable to persuade the jury that marks on Andrew were caused by a rash rather than abuse.

{¶ 152} The jury ultimately awarded plaintiffs $152,100 in economic damages and $747,000 in noneconomic damages. The jury's award of compensatory damages was consistent with the damages sought by plaintiffs and represented a very successful outcome. The jury also awarded punitive damages of $5.1 million. While not inconsistent with the evidence and arguments presented at trial, the punitive damages obtained by plaintiffs' counsel were an extremely successful result, particularly given the legal and factual challenges presented by the case.

- **Whether the fee is fixed or contingent**

{¶ 153} In this case, plaintiffs entered into a contingent-fee agreement with Cooper and Elliott. Contingent-fee agreements are typically used in cases in which the plaintiff has insufficient resources to bear the cost of litigation. In a contingent-fee agreement, the lawyer takes on a large part of the financial risk of a case because if the case is resolved against the client, the lawyer will not receive any compensation for his or her work on the case.

{¶ 154} The evidence demonstrates that Cooper and Elliott took on a very significant financial risk when entering into a contingent-fee agreement with plaintiffs. As previously identified, plaintiffs' case faced several substantial legal and factual challenges, including the sharply disputed issue of liability, the young age of the primary victim, the failure of FCCS or CPD to find abuse, the monetary resources of defendants, and the high caliber of defendants' counsel.

{¶ 155} Based upon this court's consideration of the DR 2–106 factors, the court finds that the lodestar amount does not adequately reflect the reasonable attorney fees to which plaintiffs are entitled. The hourly rate used to calculate the lodestar amount does not reflect the following: (1) the novelty and difficulty of the questions involved in this case or the skill required to perform the necessary legal services properly, (2) the fee customarily charged in central Ohio for similar legal services, (3) the amount involved and the results obtained, (4) the experience, reputation, and ability of all of the lawyers involved in this case, and (5) the contingent-fee agreement between plaintiffs and Cooper and Elliott. Mr. Rourke testified that it was his opinion that consideration of the DR 2–106 factors would appropriately require, at a minimum, that the court multiply the lodestar amount by a multiplier of two. Mr. Rourke also opined that a multiplier of three would be appropriate in this case. Mr. Rourke further testified that it was his opinion that application of the one-third contingent-fee recovery to the ultimate judgment entered against defendants would also result in a reasonable fee that is consistent with DR 2–106. The court has reviewed the evidence presented regarding the issue of attorney fees and the applicable law and finds that a multiplier of two should be applied to enhance the lodestar amount.

{¶ 156} Additionally, a court may include the litigation expenses incurred by plaintiffs in its award of attorney fees. In this case, the evidence demonstrates that plaintiffs have incurred expenses of $22,999.37 prior to the attorney-fee hearing. Evidence presented at the attorney-fee hearing demonstrates that plaintiffs also incurred additional expenses in connection with their retention of Mr. Rourke as their expert legal witness at that hearing. Mr. Rourke testified at the hearing that he charged plaintiffs $350 per hour for his services and that he had spent 14 hours preparing for and testifying at the hearing. Accordingly, plaintiffs have incurred an additional $4,900 in expenses for a total of $27,899.37 in expenses. The court finds that defendants have presented no evidence or

argument to demonstrate that this court should not award plaintiffs their expenses or that the expenses identified by plaintiffs are inaccurate, unreasonable, or otherwise inappropriate. After careful consideration, the court finds that plaintiffs are entitled to recover their reasonable expenses of $27,899.37 in connection with the jury's award of attorney fees against WHC.

### C. Conclusion

{¶ 157} In summary, the court finds that plaintiffs are entitled to their reasonable attorney fees from defendant WHC based upon the jury's award of punitive damages and attorney fees against WHC. The court finds that plaintiffs are entitled to their reasonable attorney fees and expenses of $693,861.87.

## X. Proposed Interlocutory Judgment Entry

{¶ 158} Because this decision addresses all of the outstanding posttrial issues in this case, the court finds that judgment should be entered in favor of plaintiffs and against defendants in accordance with the jury's award and this decision. Defendants' request for an interlocutory judgment entry is moot and is therefore denied.

## XI. Conclusion

{¶ 159} For all of the foregoing reasons, defendants' motion for judgment notwithstanding the verdict is denied. Defendants' motion for new trial is denied. Defendants' motions for remittitur are also denied. Because reference to plaintiffs' surreply in opposition to these motions was unnecessary, plaintiffs' motion for leave to file a surreply is denied as moot.

{¶ 160} The court finds that it is constrained by statute to enter judgment for Andrew Faieta for noneconomic compensatory damages of $250,000. The court finds that it is also constrained by statute to enter judgment for plaintiffs for punitive damages from defendant WHC of $1,628,470, which includes both the $1,528,470 awarded specifically against WHC and the $100,000 awarded against Mr. Vaughan for which WHC is jointly and severally liable. The court concludes that it is limited by the tort-reform statutes to enter judgment for plaintiffs for the punitive damages awarded against Mr. Vaughan of $0.

{¶ 161} Plaintiffs' motion for prejudgment interest is denied. Finally, the court finds that plaintiffs are entitled to attorney fees from WHC of $693,861.87 in accordance with the jury's award.

{¶ 162} The court directs plaintiffs to submit a final, appealable order reflecting this decision in accordance with Loc. R. 25.01.

Judgment accordingly.